CHARLES P. HEMENWAY & others *vs.* MARY HEMENWAY & others.

Suffolk. Nov. 19, 1879; Nov. 15, 1881; Jan. 22. — March 7, 1883. FIELD & W. ALLEN, JJ., absent.

A testator bequeathed a residuary fund to trustees, in trust " to hold the said property as they may receive the same, or at their discretion to sell the same or any part or parts thereof," and to invest the proceeds of such sales according to their best judgment, and, whenever they might deem it expedient, to sell any substituted property at any time held on the trusts, and to invest the proceeds according to their best judgment, with power to convert real estate into personal estate and personal estate into real estate, and to prefer a lower interest and gain to a larger one which might involve risk of loss, and, subject to the payment of certain annuities out of the income, " to pay all the remaining net rents and income during the continuance of this trust " to such of four persons, the testator's wife and three children, as might be living at the time of payment, and to the lawful issue of any then deceased child, such issue taking by representation. Twenty years after the death of the survivor of said four persons, the trust property was to be conveyed to the testator's issue then living, they, taking by representation according to the stocks. At the testator's death, he left bonds which were worth more than par, and which have since fallen due. Since his death, the trustees had bought other bonds, some at a price slightly above par and some at par and accrued interest. *Held,* as between the life tenants and the remaindermen, that the former were entitled to all the net interest on the bonds received from the testator or bought by the trustees when worth more than par; and that the amount paid for accrued interest on the bonds bought should be retained from the interest subsequently received.

BILL IN EQUITY, by the trustees under the will of Augustus Hemenway, to obtain the instructions of the court as to the construction of the will. Hearing before *Morton,* J., who reserved the case for the consideration of the full court. The facts appear in the opinion.

The case was argued in November 1879, was reargued in November 1881, and was again reargued in January 1883.

*J. L. Thorndike*, for the plaintiffs.

*F. E. Parker*, for the life tenants.

*C. A. Welch*, for the remaindermen.

HOLMES, J.  The plaintiffs are trustees of a residuary fund bequeathed to them in trust, " to hold the said property as they may receive the same, or at their discretion to sell. the same or any part or parts thereof, and to invest the proceeds of such sale or sales according to their best judgment, and so again, and whenever and as often as they may deem it expedient, to sell any substituted property at any time held upon these trusts, . . . . and to invest the proceeds . . . . according to their best judgment, with power to convert real estate into personal estate, and personal estate into real estate," with injunctions of caution and to prefer a lower interest and gain to a larger one which may involve risk of loss ; and, subject to the payment of certain annuities out of the income, " to pay all the remaining net rents and income during the continuance of this trust . . . . to such of the said four persons, namely, my. wife and three children, as may be living at the time of payment, and to the lawful issue then living of any my child, who has then deceased, . . . . such issue taking by representation."  Twenty years after the death of the survivor of the above four, the trust property to be conveyed to the testator's issue then living, they taking by representation according to the stocks.

At the death of the testator, June 16, 1876, he left United States bonds which were worth more than par, and which fell due December 31, 1880, and June 30, 1881.  Also bonds of the State of Massachusetts, the city of Boston, and the Chicago, Burlington and Quincy Railroad Company, which in like manner were then worth more than par, and which either have fallen due or will fall due within a comparatively short time.

Since the testator's death, the plaintiffs have bought Union Pacific Railroad Company bonds at a price slightly above par, and Burlington and Missouri Railroad Company bonds at par and what is known in the market as accrued interest.  By the usage of the Boston market, these bonds are sold at a certain price, and the accrued interest is then added to make up the full sum to be paid by the purchaser.  In New York, they are

sold "flat," as it is termed; that is, for a price which includes accrued interest.

The short questions which we are asked to determine are: Whether the life tenants are entitled to all the interest, after deducting expenses, on the bonds received from the testator, or bought by the trustees when worth more than par; and also whether the sums paid in respect of accrued interest on the Burlington and Missouri Railroad Company bonds should be retained from the interest subsequently received. The former of these two is of very great and growing importance.

It is said that, when a bond having only a short time to run is purchased at a price above par, inasmuch as it is certain that when it is paid off the trustee will only receive par, the investment is necessarily a wasting one to the extent of the premium paid, and that the rights of the remainderman are sacrificed in favor of the tenant for life, unless a due proportion of the interest is set aside to make good the waste occasioned by the approach of the day of payment. It is pointed out that otherwise the trustees in time might sacrifice the whole fund. The life tenants, while conceding the force of this argument, reply that the court must assume any investments, which it would sanction, to be absolutely safe, and therefore that the only ground of difference in the value of such investments, which the court can recognize, lies in the rate of interest which the investments pay respectively. If that be greater than the market rate, the bond will stand above par; if less, below. And it follows, they say, from the same reasoning which would entitle a remainderman to have the capital protected by a reservation from interest if a short bond is purchased above par, that the tenant for life must have his full interest made good out of the increasing capital if a short bond is purchased below par. If a rule be laid down which will work both ways, the tenants for life seem content. And the remaindermen, of course, desire a determination that the premiums must be made good in all the investments, and a rule broad enough to insure that result on the facts before us.

We incline to agree with the argument for the life tenants, that the only legal reasoning which would warrant throwing the burden of premiums upon interest must start from the

assumption that the premium is paid in respect of interest, and that, upon that assumption, the life tenants have an equally strong claim upon the increment of capital in the case of short bonds bought below par.    But we do not think that the general rule suggested can be laid down with safety for either class of cases. The only conclusive reason which could be offered in its favor would be, that it was shown to aid in doing substantial justice between tenant for life and remainderman.    And that, we think, is not made out.    In the first place, the proposed rule reposes upon a fiction.    It is not true that premiums are paid for interest alone.    They are paid for the safety of the capital as well. Probably, much the greater part of them is made up of this and other elements which ought to fall on the remainderman.    The court can hardly be asked to close its eyes upon the truth, in order to lay down a rule which can only be justified on the ground that it is actually beneficial.    Moreover, as the decisions of this court show that trustees have been exonerated from liability for investments which turned out not to have been safe, there is not even a technical foundation for the postulate.

But we are not only required to start with a fiction.    As the next step, we must lay down a fixed and arbitrary rule for what is really in a constant state of fluctuation.    For, in order to estimate how much of a given premium is paid for the difference between the interest of the bond and that which the life tenant ought to receive, we have to establish a rate for the latter as our starting-point.    This would naturally be the market rate, if that were ascertainable.    But there would be no justice in stopping at the rate when the bond was bought merely.    If theoretical accuracy were possible, the tenant should receive the current rate of interest at every moment.    But the current rate is continually varying from day to day and from month to month, apart from the greater variations to be found by taking a series of years.    These variations alone would make actual calculations impossible, but they are a strong objection to establishing a constant rate for the interest of the tenant for life.    Unless the court should take upon itself to study the market and to make new orders from time to time, it might well come to pass that the judicial rate should differ more widely than that of the bond from the rate of the market.

The variations in the rate of interest are not the only ones. The capital itself also varies from day to day for reasons independent of the rate of interest. There is no difference in the rights of the parties, or the duties of trustees, at different moments. These remain substantially the same, for every day that an investment is kept, as they are when it is made. A determination not to sell, if a sale is possible, stands on much the same footing as a purchase. The same reasons that are offered for laying down an absolute rule that compensation shall be made to the capital out of income for a premium paid for bonds, equally require a similar further allowance if the bonds advance, or an offset on the other side of the account if they fall for other reasons than the approach of maturity.

We think, then, that it would be inexpedient and unjust to lay down such a sweeping general principle as is contended for on behalf of the remaindermen, either with or without the complement which would make it satisfactory to the tenants for life. If a universal rule were attainable at all, it would be more easily reached by confining trustees to one or more investments of a kind that would never be paid off, or of which the day of payment was so remote as not practically to affect their value during the continuance of the trust. For then it would matter little or nothing to either party whether the purchase was at a price above or below par. But the precedents in this Commonwealth are against such a course; and the reasons on which the early cases are founded have rather gained than lost in force.

The English cases go the whole length of deciding that, whenever a fund is held upon an authorized permanent investment, the tenant for life receives the entire actual income. Among the investments authorized by statute was East India stock. This yielded a higher rate of interest than the three per cent government stock, and was therefore desired by life tenants; but it was liable to be paid off, and it sold at a premium, and was therefore objected to by remaindermen. When a trust fund was in court, the court would not ordinarily direct an investment in this stock; (*Cockburn* v. *Peel*, 3 DeG., F. & J. 170; *Ungless* v. *Tuff*, 9 W. R. 729; *In re Boyces*, I. R. 1 Eq. 45; *Waite* v. *Littlewood*, 41 L. J. (N. S.) Ch. 636;) unless there were special reasons for favoring the life tenant. *Equitable Reversionary Interest Society*

v. *Fuller*, 1 J. & H. 379, affirmed July 17, 1861, Lewin on Trusts (7th ed.) 284. *Bishop* v. *Bishop*, 9 W. R. 549. *Cohen* v. *Waley*, 7 Jur. (N. S.) 937. But in *Cockburn* v. *Peel*, Lord Justice Turner was careful to say that the decision was not intended to embarrass trustees in the exercise of the discretion which the statute gave them when the funds were not in court, and that they would be entitled to protection when they acted *bona fide* in the exercise of that discretion. And this statement was affirmed and applied in *Hume* v. *Richardson*, 4 DeG., F. & J. 29, the next year. The latter case then went on to decide that, where trustees, in the exercise of their discretion, retained or made investments in East India stock, the tenant for life was entitled to the whole income arising from such investments. The same conclusion was reached by Lord Cairns in a later case, in which *Hume* v. *Richardson* was not referred to, with regard not only to East India stock, but other securities which the testator had authorized as permanent investments, and which otherwise would have been unauthorized. *Brown* v. *Gellatly*, L. R. 2 Ch. 751. See, further, *Meyer* v. *Simonsen*, 5 DeG. & Sm. 723, 726.

There is another branch of *Brown* v. *Gellatly* similar in principle to *Kinmonth* v. *Brigham*, 5 Allen, 270, which has no bearing on this case. It often happens, of course, that testators leave property of a kind which executors would not be authorized to invest in, such as ships, or a share in a partnership. In such cases, the law allows the executor a proper time for the purpose of disposing of such property. But the fact that time is allowed in order to prevent a sacrifice, does not make the investment an authorized one *ad interim*, in such sense as to entitle the tenant for life to the actual dividends. The conversion would be made at once if it were practicable, and the rights of the parties are not affected by the delays. The fund is treated as if converted, and the tenant for life is allowed a fixed percentage on the amount. *Meyer* v. *Simonsen, ubi supra. Re Llewellyn's trust*, 29 Beav. 171, 174. Cf. *Dimes* v. *Scott*, 4 Russ. 195, 209. The same thing is true, where a testator allows time for the same purpose. In *Brown* v. *Gellatly*, the testator had left ships, etc., and had authorized his executors to sail them until they could be satisfactorily sold, which he left to the discretion of his executors. As it was evident that this was only done with the

intent to have the ships converted cautiously and in proper time, it was held that the tenant for life was not entitled to the actual profits of the ships, but to four per cent on a valuation as at the death of the testator, and no more.   The ships were not made an authorized permanent investment by reason of the fact that a long time was allowed to dispose of them.

Our refusal to lay down a general rule does not put the capital in danger of being exhausted.   The trustee, who has the fund always in his hands and under his eyes, must take reasonable care to hold the balance even between opposing interests. The answer to the extreme cases supposed on behalf of the remaindermen is, that, if they were conceivable where the trustee was acting in good faith, they would be inconsistent with that reasonable discretion which he must exercise at his peril.   This responsibility is what trustees are paid for assuming, and we have no reason to suppose that it has proved too great to be borne.   We think that the course most advantageous to all parties concerned is for us to confine ourselves to dealing with each case that may come before us on its particular circumstances, and to allow trustees all the freedom that is consistent with caution and fairness.

Coming, then, to the particulars in the present case, we think the trustees were authorized to retain the testator's bonds mentioned in the bill until they were paid off.   By the residuary clause they are " to hold the said property as they may receive the same, or at their discretion to sell the same."   The power thus given to hold the property as they may receive it, is not an extension of the time for conversion, but authority to continue an investment as such, and the whole net income of investments thus authorized must go to the tenants for life by the terms of the will.   *Brown* v. *Gellatly, ubi supra.   Bulkeley* v. *Stephens,* 10 L. T. (N. S.) 225.   *Green* v. *Britten,* 1 DeG., J. & S. 649.

With regard to the bonds of the Union Pacific Railroad Company purchased in 1878, and then having nearly eighteen years to run, the fact that a small premium was paid is not, of itself alone, enough to prevent the tenants for life from receiving the net interest, and the circumstances, so far as disclosed, show no special reason why they should not receive it.   The investment

constitutes a very small proportion of a large estate. Nothing shows that the premium was paid for interest above the market rate. We have no reason to doubt that, taking the whole administration of the trust into account, the balance has been evenly held between the two parties; and the relation between the remaindermen and the life tenants is such that there is less call than there might be in some other cases for treating the life tenants with great strictness.

Lastly, as to sums paid in respect of accrued interest. It is true that there are strong decisions of Vice-Chancellor Kindersley to the effect that no allowance is to be made for them except under very special circumstances. *Scholefield* v. *Redfern*, 2 Dr. & Sm. 173, 182. *Freman* v. *Whitbread*, L. R. 1 Eq. 266. See also *Bostock* v. *Blakeney*, 2 Bro. C. C. 653; Lewin on Trusts (7th ed.) 297. But the reason offered, that it would lead to burdensome and expensive investigations, does not seem to us to apply here. By the Boston usage, the sum paid for accrued interest is always expressly stated, and we see no reason why it should not be repaid from interest subsequently received. It has been in some cases in England. *Londesborough* v. *Somerville*, 19 Beav. 295. *Bulkeley* v. *Stephens*, 3 N. R. 105, 107; *S. C.* 10 L. T. (N. S.) 225, 229.                    *Decree accordingly.*