## NEW ENGLAND TRUST COMPANY, trustee, *vs.* MARY J. EATON.

Suffolk.   Nov. 21, 1884; Nov. 18, 19, 1885. — Jan. 9, 1886.

The Probate Court, in passing upon the allowance of the account of a trustee under a will, may determine whether the trustee has accounted to the parties entitled to the income of the trust fund for the whole of the income; and the question of the correctness of such determination is open in this court on appeal.

If a trustee under a will, who holds a fund in trust to pay the income to a person during his life, with remainder over, makes an investment in bonds which are payable at a day certain, and are bought at a premium, he is not obliged to pay the entire net income to the tenant for life, but is entitled to deduct such an amount from the actual interest received on each bond as will, by successive deductions, make good to the capital the amount of premium paid upon the original purchase of the bond, without regard to the market value of the bond at the time of making such deductions.  MORTON, C. J., C. ALLEN & HOLMES, JJ., dissenting.

DEVENS, J.   This is an appeal from a decree of a single justice of this court, affirming a decree of the Probate Court, by which the account of the New England Trust Company, a trustee holding a fund, the income of which is payable to a tenant for life, with remainder over, was disallowed.   The system pursued by the trustee with reference to the investments which it had made in bonds, and other promises to pay, of the United States government, or of municipal or railroad corporations, due on a day certain, and which had been bought at a premium, has been to ascertain, by tables in use among bankers and brokers, what is in fact the net income arising from these promises, considering the premium actually paid by the investing trustee, which would not be repaid at the maturity of the bond, the rate of interest, and the date of payment of the security, and to pay over this net income to the life tenant, the difference between this net income and the actual rate of interest as received going to a fund, which, at the date of the maturity of the promise, would leave the original capital intact.   The decree appealed from directed the trustee to pay to the life tenant, as income, the sums thus reserved for the purpose of being returned to the capital.

Whether the question presented may be heard and adjudicated by the Probate Court, and thus by this court, on appeal,

has been doubted. The New England Trust Company is a testamentary trustee, compelled by statute to render its accounts, at least once a year, to the Probate Court, of the hearing on which the fullest notice must be given; and the question is one immediately connected with the administration of the trust. The Probate Court has full power to see and provide that every interest shall be fully represented, and it is to be observed that that court has also, concurrently with the Supreme Judicial Court, full jurisdiction to hear and determine in equity all matters in relation to trusts created by will. Pub. Sts. *cc.* 141–143. It had the right to determine whether, upon the account rendered by the trustee, it was the trustee's duty to charge itself with the sums it had set aside as a part of the capital of the estate, and to pay them over as income.

Without discussing those cases in which it has been held that, in settling the accounts of the executors of a will, the relative rights of legatees under a will, and other questions arising under the will in reference thereto, cannot be decided, all of which are not perhaps fully reconcilable, they do not affect the question of jurisdiction here involved. *Granger* v. *Bassett*, 98 Mass. 462, 469. *Cowdin* v. *Perry*, 11 Pick. 503, 512. *Burbank* v. *Whitney*, 24 Pick. 146, 152.

Even if we should hold that it was intended that, in the administration of an estate, the Probate Court should not pass upon the difficult questions of construction often arising out of wills, but should determine simply the amount of property subject to distribution, it could not affect the present inquiry. The specific object of requiring trustees to render annual accounts is to ascertain whether the trustee has properly dealt with the trust property. In a case such as the one at bar, the trustee necessarily includes in his account the payments he has made, and states the investments in which he holds the trust property. If he has paid over to the tenant for life that to which the tenant is not entitled, he should not be allowed therefor; and if, on the other hand, he has transferred to the corpus of the fund that which he should not, this should be corrected.

Upon the hearings in the Probate Court and in this court upon the accounts of trustees, questions similar to the principal one in the case at bar have heretofore been determined. In

*Harvard College* v. *Amory*, 9 Pick. 446, it was determined whether a sum received by the trustees of an estate was rightfully paid to the widow of a testator, instead of being reinvested by the trustees as a part of the capital of the trust fund. In *Heard* v. *Eldredge*, 109 Mass. 258, upon the appeal by the life tenant from the decree of the Probate Court allowing an account by which a certain sum was treated as capital, and not as the income, of a trust fund, the decree of the Probate Court was affirmed. To the same effect are *Bowker* v. *Pierce*, 130 Mass. 262, and *Dodd* v. *Winship*, 133 Mass. 359.

The case of *Wright* v. *White*, 136 Mass. 470, is not inconsistent with the view that, upon the settlement of an account of the trustee, it may be determined whether a sum of money should be treated as the capital or the income of a trust fund. The decree upon such an account deals only with what has been done in the past, although a decree allowing an account of what has been done may afford a guide in ascertaining what will be allowed in the future. All that was said on this subject in *Wright* v. *White*, *ubi supra*, is, that, in a decree allowing an account, a direction as to the mode in which a trustee should thereafter manage the trust fund was not properly a part of the decree allowing an account, and was to be stricken out.

We proceed, then, to consider whether the course pursued by the trustee was correct, and thus whether the account of what it has done is to be allowed.

It is the general rule, that, where investments are made in property of a permanent character, and not in terminable securities, the loss or gain in such investments is that of the corpus of the estate. If, for any cause, an investment be reduced in value, and it becomes necessary to sell it, the sum for which it is sold becomes a new principal, on which the life tenant is to receive the income. In the management of real estate, when permanent improvements are placed thereon, they are a proper charge on the capital, while usual and ordinary repairs are a deduction from the income. *Parsons* v. *Winslow*, 16 Mass. 361.

If a trustee purchases shares in the capital stock of a bank, inasmuch as the remainderman will receive exactly that which is purchased, the tenant for life should receive the full income thereof undiminished. Such was the course pursued by the

trustee in the case at bar, in regard to the bank shares purchased by it. Nor does it become the duty of the trustee to sell such shares, should they appreciate in value after he has invested in them, and to pay over to the tenant for life the amount which they have increased in value. If it becomes necessary, in the proper administration of the trust estate, to sell such shares, the gain or loss is that of the capital of the estate, and the sum received constitutes a new principal.

The tenant for life does not seek any order by which the bonds, the interest on which is here under discussion, are to be sold, or the investments changed. Nor can it be contended that these securities are not of a class in which trustees may invest, if due care has been used in the selection. The rule, says Chief Justice Shaw, " that no investment can be considered safe, or can be approved by a probate court or court of equity, except in public securities, however well supported by authorities, as a rule well established in English courts of equity, is wholly inapplicable to this country, and untenable." *Lovell* v. *Minot*, 20 Pick. 116, 119. While there are now many more public securities than those which existed when these remarks were made, investments cannot be confined to them. A loan at a fixed rate of interest, even if secured by the stock of a manufacturing or other business corporation, as collateral security, if proper precaution is taken against fluctuation, is not necessarily injudicious. *Brown* v. *French*, 125 Mass. 410. There are many stocks under public supervision, such as bonds of corporations where there is sufficient capital to insure their safety, which, with bonds of municipalities, loans secured by mortgage, &c., constitute proper investments.

The purchase of the bonds by the trustee in the case at bar appears to have been judiciously made ; substantially all have appreciated in value ; and they are of the class of securities contemplated as investments by the statutes under which the trustee does its business. Sts. 1869, *c.* 182, § 5 ; 1871, *c.* 142. Pub. Sts. *c.* 116, § 20.

Assuming that the purchase of bonds at a premium was safe and prudent, and such as judicious men would make in the conduct of their affairs, which is substantially the rule heretofore laid down, the question arises, inasmuch as it is certain that the

corpus of the fund is to be diminished if this investment is permanent, whether the trustee may retain such sums annually as will restore to the fund, at its maturity, exactly what was taken therefrom at the time of the purchase. This is what the trustee has undertaken to do. If, as suggested in argument, there is any inaccuracy in the calculation by which this result is reached, this is a subordinate matter, to be determined by more accurate accounting, should it be required, not necessary now to be discussed. That which is really income from a bond purchased at a price above par, say $120, and payable in ten years, is not the amount received in interest annually, but that amount, deducting therefrom the sum necessary to restore, at the end of the ten years, the $20 premium. No prudent man would treat as income from his property the whole amount received, when there was thus to be a diminution of his principal amounting at the end of the ten years to this premium, and steadily tending to this during the entire period. To deal with interest thus received as income purely, would, to the extent of the premium, exhaust the capital. The premium paid is no more than an advance from capital, which the remainderman is entitled to have repaid, if he is entitled to receive the capital intact. If, in such a case, the tenant for life should die before the maturity of the bond, and thus the whole advance not then be repaid, he would have paid no more than his just proportion. Unless the premium is to be restored, it is not easy to see how investments in bonds bearing a premium can, in justice to the remainderman, be made, his property where a bond is kept to maturity being diminished solely for the benefit of the tenant for life. Into the question how much income an investment at a premium in a bond payable at a fixed future time produces, the loss of the premium at that time necessarily enters as a factor.

The bonds purchased by the trustee have substantially all appreciated in value, and this to such an extent that, if they were now sold, the surplus above the sum which would be necessary to restore to the capital all that was paid at the time of purchase by way of premium would enable the trustee to pay the tenant for life the deductions that have heretofore been made in order to repair the principal at the maturity of the bond. The life tenant therefore insists that the trustee should now be ordered to

pay to her these sums, since, if a sale were made at this moment, they would not be needed to repair any deficiency in the principal. The trustee is to manage the fund in his hands, not for the purposes of speculation, but in regard to the permanent disposition of the fund. *Harvard College* v. *Amory*, and *Lovell* v. *Minot, ubi supra.*

The argument of the tenant for life, that the practice of holding securities until their maturity would deprive him of the very care and ability in the management of the trust for which he pays compensation to the trustee, can readily be pressed so far as to sanction a practice of trading and trafficking in trust securities, which would be attended with dangerous results to the trust fund. Investments carefully and judiciously made are not, as a general rule, to be disturbed. The argument of the tenant for life asserts that the income obtained for her is less than one half of that which might be obtained on absolutely safe mortgages. The case affords no evidence of this, nor in this proceeding, which only concerns the account of the trustee and the amount of its payments to the tenant for life, could it be settled whether, in this view, the trustee should be ordered to dispose of these securities.

But if the securities were sold, and a larger sum realized than would be necessary to restore to the corpus of the estate that which was taken from it when they were purchased, the question would still be, whether the appreciation of the securities in market value was the property of the tenant for life, or of the remainderman. There is no ground on which it can be contended that it belongs to the tenant for life, unless she is also to be made responsible when loss occurs in the purchase and subsequent sale of securities. There cannot be this chance of profit for her, unless there is to be a corresponding risk in such transactions. If the rule be just, that, when a security is kept to maturity, income is to be paid only to such an extent as shall leave the corpus of the estate at that time intact, by restoring to it the premium paid at the time of purchase, it is equally just that the gain or loss that occurs by a sale thereof, if for any cause one shall become necessary while it is running, should be that of the corpus of the fund. The estate of the tenant for life will be unaffected thereby, except so far as it may be altered when a change is made

in securities by the increase or diminution of the sum to be re-
invested. To expose the estate of the tenant for life to any risk
beyond what is involved in this, — and, because there may be a
possible chance for gain, under some circumstances, by changes
in investments, to subject it to the loss which occurs, when, for
any cause, it becomes necessary to sell at a diminished price se-
curities purchased for the trust estate, — would be to defeat the
object for which tenancies for life are in most cases created.

In *Parsons* v. *Winslow, ubi supra*, there had been a loss to the
trust estate by the defalcation of the trustee, whose successor had
been able to recover from him, in value, only a portion of the
property originally entrusted to him. It was held that the re-
covered fund, thus diminished, would constitute a new principal,
and that the loss would thus " be apportioned in the same man-
ner, as if it had arisen from the fall in the price or value of
any public stocks, or of any land, in which the fund should have
been invested according to the provisions of the will." It is said
by Mr. Justice Jackson : " It would be unjust, and contrary to
the manifest intent of the testator, if the tenant for life, on the
one hand, should continue to receive the whole amount of the
interest on the original fund, after the principal had been thus
reduced; or if, on the other hand, the income should be applied
to replace the principal. In the one case, the tenant for life
would be left, for an indefinite period, without any support or
benefit from the intended bounty of the testator; and in the
other, the reversioner might lose the whole that was intended
for him."

It has been suggested, that a suspense account might be kept
by the trustee, to which sums such as have in the case at bar
been retained might be carried, and that, if hereafter the bonds
should be sold before maturity at an advance, the life tenant
should be entitled to receive therefrom all that is not required
to restore the capital originally invested. This suggestion is
based upon the theory, that any possible profit made by the sale
of securities belongs to the tenant for life, and still involves the
idea that she must bear the possible loss. We cannot concede
this, except so far as her estate is affected by the increase or
diminution of the sum to be reinvested. Such a suggestion
would require, as a corresponding duty, that when a bond was

depreciating in value such sums should be retained from the life tenant's income as would be necessary to repair the loss to the capital of the estate by such depreciation, should it be sold before maturity.

There can ordinarily be no better test of the true income which a sum of money will produce, having regard to the rights of both the tenant for life and the remainderman, than the interest which can be received from a bond which sells above par and is payable at the termination of a fixed time, deducting from such interest, as it becomes due, such sums as will at maturity efface the premium. If such a bond has increased in value since its purchase, assuming it to have been an entirely safe investment, and none other should be made, it is because a change in the rates of interest, or some similar cause, has altered market values. There would be no reason to suppose that such a bond could be sold, and the amount received reinvested at a higher rate of interest, unless at the sacrifice of some safeguard in the investment. Investments of trust property should be made with a view to safety, and changes should not be made except after much inquiry and circumspection, and ordinarily with an immediate and advantageous reinvestment in contemplation. In making such changes, a trustee is not entitled so to exercise his authority as to vary or affect the relative rights of the *cestuis que trust*. Hill on Trustees, (4th Am. ed.) 758.

The only case in this country which we have found, or to which we have been referred, deciding the question we have considered, is *Farwell* v. *Tweddle*, 10 Abb. N. C. 94, in which it was held that a course similar to that pursued by the trustee in this case was correct and proper.

Not much assistance is to be expected from the English cases, as until the St. of 22 & 23 Vict. *c.* 35, § 32, authorizing investments in East India stock and bank stock, only one security, the three per cent consols, was there recognized as proper for trust estates. An investment in the three per cents, which it is not contemplated will ever be paid, and the holders of which have been considered as perpetual annuitants, has been deemed the only safe investment, and peculiarly adapted for the purpose, as until a recent period they have been below par. The principle is well established by all the English cases, that the corpus of

the trust capital is to be kept intact, so that the remainderman may thus receive it, while, in justice to the life tenant, it must be kept in income-producing property. Where the testator makes a general gift of his estate to, or in trust for, a person for life, with remainder over, so much of the property as consists of leaseholds, terminable annuities, or other interests of a perishable nature, must be converted, and reinvested in these permanent securities. As they are permanent, whether purchased below or above par, the life tenant receives the full income, the remainderman receives undiminished that which has been purchased, and no adjustment of the relative rights of the respective *cestuis que trust* has been necessary.

There may be specific gifts of terminable or perishable securities of such a character as to show an intention on the part of the testator that the life tenant may exhaust or consume them. In the absence of such intention, if, in contravention of the general rule, the trustees suffer the tenant for life to receive the whole income arising from such securities, he will be decreed to refund what he may have received over and above what he would have received if the conversion had been duly made and the proceeds invested in the three per cents. This difference is treated as capital to be invested for the benefit of all parties entitled, and the tenant for life is bound to make it good in the first instance. On his failure to do so, the trustees are responsible therefor. Hill on Trustees, (4th Am. ed.) 591, and cases cited. Perry on Trusts, § 547.

The same principles have been applied since investments of trust funds were, by the St. of 22 & 23 Vict. *c.* 35, permitted to be made in East India stock, which is a security that may be redeemed, as well as in certain other stocks named. The courts have constantly refused to allow any investments to be made therein, unless there were peculiar reasons for favoring the life tenant, or at the request and on the application of the settler of the trust. *Equitable Reversionary Interest Society* v. *Fuller*, 1 J. & H. 379. In such case the direction has sometimes been, that the investment should not be made unless the stock could be purchased at par. *Waite* v. *Littlewood*, 41 L. J. Ch. 636. One reason, given in *Cockburn* v. *Peel*, 3 De G., F. & J. 170, for refusing to permit a purchase of East India stock, was that it

must be purchased at an advance, and that there was no provision in the act for any sinking fund by which the deficiency made in the capital could be supplied.

In *Hume* v. *Richardson*, 4 DeG., F. & J. 29, it was held, that, for the period between the death of the testator and the passing of the St. of 22 & 23 Vict. *c.* 35, the life tenant was entitled only to such income as she would have received had the stock been converted and invested in consols, and that, although after the passage of this statute she was entitled to the whole income, yet the trustees were only justifiable in keeping the East India stock until a suitable investment could be made in lands, in which by the will the trustees were directed to invest.

*Brown* v. *Gellatly*, L. R. 2 Ch. 751, decides no more on this subject than that, when a testator authorizes investments as permanent which would otherwise be unauthorized, the life tenant has the full income. The authority given by the will indicated a preference of the life tenant to this extent, which took the case out of the ordinary rule. "I understand," says Lord Cairns, "the words of the will as amounting to the constitution by the testator of a larger class of authorized securities than this court itself would have approved of, and the court has merely to follow his directions, and treat the income accordingly, as being the income of authorized securities." Other securities not coming within this class were ordered to be converted as soon as possible, and, until this could be done, it was decreed that the life tenant would be entitled thereon "to the dividends upon so much three per cent stock as would have been produced by the conversion and investment of the property at the end of the year," — that is, a year after the testator's death.

The method in which the English courts deal with leasehold estates, a common species of terminable securities not known in the same form in the United States, where they are settled in trust for life, with remainders over, under such circumstances that the settler must have regarded them as continuing interests for all the beneficiaries of the trust, including the remainder-man, is strictly analogous to that which the trustee in the case at bar has pursued. These estates, which are terminable on a life or lives, or at the end of fixed terms, are renewable sometimes by express contract and sometimes by custom which has been

recognized as legal, upon the payment of certain fines and other expenses. It is held to be the duty of the trustees to preserve the lease hold estates by renewing, at the usual periods, for the benefit of the parties in remainder. In the absence of other direction by the settler, the fine, &c , for the renewal is to be paid out of the rents and profits, in the proportion in which the *cestuis que trust* enjoy the estate. If a renewal becomes impracticable, the tenant for life does not reap the whole advantage of nonpayment of the sum properly due for renewal, if there is an express trust for renewal. His interest, less the expenses of the renewal, is all that is given him, and his proportion of the amount fairly to be paid for renewal is still a proper charge on the leasehold estate, for the benefit of the remainderman. Where the leasehold estate is for years, the amount to be paid is readily ascertainable by the proportion which the tenant for life enjoys of the leasehold estate. Where it is for lives, and there is no express fund created for the renewal, it is more difficult, and the court has sanctioned the plan of insuring the lives of the *cestuis que vie* to an amount sufficient to cover the usual expense of renewing on the dropping of a life. Hill on Trustees, (4th Am. ed.) 683.

While the cases on this subject are complicated by the express provisions made in the settlements, and appear in some respects confused, they establish fully the position, that, in the absence of direction otherwise, the property received is to be turned over by the tenant for life as he received it, and that his income is not the full rents and profits, but these after deducting therefrom, as accurately as it can be ascertained, his just proportion of the expense of maintaining the security by renewal of the lease.

The tenants for life rely much upon *Hemenway* v. *Hemenway*, 134 Mass. 446. This was a bill in equity which brought before us the whole management of a large estate, in which very ample discretionary powers had been given to the trustees. The testator had left, subject to the trust, bonds payable at a fixed period. As between the tenants for life and the remaindermen, it was decreed that the trustees, by the authority conferred by the clause of the will " to hold the said property as they may receive the same, or at their discretion to sell the same," were

entitled to continue these investments as such, and to retain these bonds until they were paid off, and that " the whole net income of investments thus authorized must go to the tenants for life by the terms of the will."

There was also an investment made by the trustees in certain bonds having nearly eighteen years to run, on which a small premium had been paid. The case was decided upon its own peculiar circumstances, which, so far as disclosed, were held to show no special reason why the tenants for life should not receive the interest paid on the bonds. The investment constituted " a very small proportion of a large estate," and Mr. Justice Holmes remarks: " We have no reason to doubt that, taking the whole administration of the trust into account, the balance has been evenly held between the two parties; and the relation between the remaindermen and the life tenants is such that there is less call than there might be in some other cases for treating the life tenants with great strictness." It certainly was not held that the trustees might not, under some circumstances, purchase for the trust estate, at a premium, bonds payable at a fixed time, and, exercising their discretion honestly and for the purpose of dealing fairly with both parties, might not reserve some portion of that paid as interest, sufficient at the end of the period to restore the premium to the capital, by the loss of which it would otherwise be depleted.

Upon the account rendered by the trustee in the case at bar, as heretofore said, the question whether, by virtue of our supervision over trusts, the trustee should be ordered to change its investments, is not brought before us. Upon these as they exist, the deduction from the full interest reserved to restore the premium at the end of the term was properly made. It is only thus that the property can be turned over to the remainderman undiminished. If the estate of the tenant for life terminates before the bond is payable, the cost of effacing the premium will be borne in the right proportion by the respective *cestuis que trust.*

In the opinion of a majority of the court, the entry in the case should be                                                 *Decree reversed.*

HOLMES, J.   If the opinion of the majority of the court went on the ground that, so far as appears, the trustee might have made these investments with the intent to keep them until the trust expired or the bonds matured, and in the exercise of its discretion as a business manager, in view of the particular circumstances of the case, thought it necessary to retain a fund in suspense against a probable loss of premium, speaking for myself alone, I should have been disposed to acquiesce in that opinion.   But, from the main line of reasoning actually adopted, I am constrained to dissent, upon grounds both of principle and authority.

Shortly stated, I understand that reasoning to be this: that, if a bond is bought at a premium, it must be assumed that the premium is paid for the single reason that the rate of interest on the bond is higher than the market rate, because it must be assumed that the investment is absolutely safe; that therefore the analogy of wasting investments, such as leaseholds, applies; and that an annual deduction from interest is proper.

So far, this is precisely the argument which was pressed upon us with much force in *Hemenway* v. *Hemenway*, 134 Mass. 446, and which was rejected after the gravest deliberation.   A great part of the opinion was devoted to answering it, and it still seems to me that the discussion was necessary to the decision of the case.

*Hemenway* v. *Hemenway*, as I conceive, did not bring before us the whole administration of the estate, but certain specific questions, one of which was, whether the interest should make good the premium paid by trustees for bonds purchased by them above par.   If the rule now adopted had been recognized, it would have been unnecessary and improper to look beyond the particular bonds to the rest of the account.   It was because that rule was repudiated, that it was said, and deliberately said, that nothing showed that the premium was paid for interest above the market rate, and that the whole administration of the trust might be considered.   The latter principle is not the law in jurisdictions where authorized investments are limited in number, as in New York, but each investment is dealt with separately.   The only reason for departing from the precedents elsewhere was, that, in the latitude allowed trustees in this Commonwealth,

it was thought impossible to assume that premiums were paid in respect of interest alone.

I think, therefore, that the reasoning of the majority is opposed to one of the points directly decided in *Hemenway* v. *Hemenway*, as it certainly is to the main line of discussion in that case, and I am confirmed in my opinion by the fact, that two others of the four surviving justices who took part in the decision are of the same mind. I must suppose that *Hemenway* v. *Hemenway* has been accepted by trustees as expressing the settled opinion of the court. I cannot foresee the extent or nature of the evil that may follow from our abandoning what has been acted on as law. But I should be most unwilling to overrule a decision which I supposed to have been accepted as a guide in dealing with property, even if I thought it wrong. I do not, however, think either the decision or the reasoning in *Hemenway* v. *Hemenway* wrong, and I refer to that case for what I do not deem it necessary to repeat here.

But I understand the opinion of the majority not to stop with overruling *Hemenway* v. *Hemenway*. In this case, the bonds thus far have not depreciated, but have risen in value. No part of the premium has been lost as yet. But the argument is either that it is to be presumed that the bonds will be kept until the premium is lost, or else that the approach to maturity is a constantly acting cause which depreciates the bond so much each year with mathematical certainty, and that, even if the depreciation is disguised by a more powerful motion the other way, it must be allowed for, because the rise in value belongs wholly to the corpus, and would have been so much greater but for this counteracting influence.

I think I fully appreciate the logical force of this argument, but it appears to me to illustrate the danger of relying on logic when the premises are fictitious. The necessary premise for casting the whole burden of repaying premiums upon interest is that the premium is paid solely for interest above the market rate. If that premise is a fiction, as I think it is, and if considerations of policy are held, nevertheless, to justify its adoption, at least the conclusions to be drawn from it should be guarded and restrained by considerations of a similar nature. I can hardly think that, if the trust had been terminated or the

bonds sold at the date of the account, when the corpus had actually gained by the investment, the sums retained from interest would be paid over to the remainderman. Yet that conclusion seems to me to follow from the reasoning.

I think, in other words, that the question of holding the balance even between tenant for life and remainderman is a problem so dependent on the particular facts, and so complex, that, while we cannot hope to solve it with perfect accuracy, every one would feel that to cut the knot with a formula in the case I have supposed would be an unnecessary abandonment of the discriminations within our power, and, as a practical judgment, would be as likely to work injustice as justice.

If I am right so far, what difference can it make that the trustee has not sold? Whether it is or is not true, as is said in *Hemenway* v. *Hemenway*, that a determination not to sell, if a sale is possible, stands on much the same footing as a purchase, I apprehend that, if a trustee having the usual powers sells and reinvests twenty times in as many days, he is not *ipso facto* guilty of a breach of trust, and that, if the reinvestments are proper and profitable, his conduct would not be open to animadversion. On this point the English books can give us no light. At all events, this trustee might sell now if it saw fit. On what ground is the determination of the trustee not to sell — a determination which, in this case, the court cannot revise — to change the relative rights of the *cestuis que trust?*

Let us look a little further into the rule adopted. Suppose a sale to have taken place, and other bonds to have been bought at a price above par. The trustee will, of course, compute the rate of interest to be received by the tenant for life in the future by deducting the annual sums necessary to replace the new premiums paid. But there is no particular sanctity in the rate which happened to prevail at the moment of purchase, still less in the rate artificially determined by the premium paid. If there has been no sale, but the market price of the bonds has risen, *ex hypothesi* the rate of interest is conclusively proved to have fallen, because a fall in the current rate of interest is the only recognized ground for a rise in price. Why is not the remainderman entitled to have a new computation started on that footing? Why is not the tenant for life entitled to have the

reservation diminished if the rate of interest rises? And, pushing the principle to its logical result, why is not the trustee bound to follow the fluctuations of the market from day to day, attributing them all to the fluctuations of interest, as he is bound to do?

I now recur to the premises of the argument which I am opposing. I repeat what was said in *Hemenway* v. *Hemenway*, that I do not see how we can start with the assumption that all proper investments are absolutely safe, when the leading case in this State is to the very point that an investment may be unsafe, and yet justifiable. *Lovell* v. *Minot*, 20 Pick. 116. But the assumption appears to me to be inconsistent with facts which we must notice, and to lead to conclusions not yet mentioned, which we could not accept. Within a few years the first mortgage four per cent bonds of a flourishing railroad have sold at eighty-five, while at the same time United States four per cents stood at one hundred and twenty or more, and city fours of a high rank stood at about par. The differences were not to be accounted for by the difference of time which the bonds had to run, or by exemption from taxation. I should be surprised to learn that either bond was not a proper investment. If they were all proper investments, the difference in price could not be referred to difference in interest.

Again, if the fiction of safety be adopted, I still do not see why it does not follow that, if a bond is bought below par, the tenant for life is equally entitled to an annual increment on the interest received by him as the bond gradually approaches maturity. This was argued in *Hemenway* v. *Hemenway*, but I must believe that such a doctrine would disconcert trustees not a little. Of course, it would call for sales of capital from time to time to produce funds for the tenant for life beyond the amount received on the bonds. There is a well-known bond which was purchased by trustees a few years ago at fifty per cent, and which now stands at one hundred and twenty or over. How is a case like that to be dealt with?

If it be said that the consequences suggested follow only upon an attempt to carry logic too far, and that they are to be controlled by practical judgment, I agree. But I think that the same thing ought to be true of the step now taken, as I have

said already.   If we are to start with a fiction and then apply logic, I think these results follow.   If we are to use our judgment, I do not see why we should not use it at every step, and I believe that to make the tables referred to the universal arbiter between tenant for life and remainderman is not so near an approach to justice as we may hope to reach.   I am much more disposed to regard trustees as a sort of domestic tribunal, *ex necessitate*, between the parties, subject to the control of the courts in case of a want of good faith or reasonable judgment.

Finally, I must repeat what was said in *Hemenway* v. *Hemenway*, after an elaborate examination of the English books, that in my opinion the English cases do not apply the principle of wasting investments to premiums on authorized permanent investments.   But, even if they did, I should consider that, in view of the latitude of investment allowed in Massachusetts, and the great fluctuations of American securities, it would be undesirable to accept that principle at present, and still more so, to adopt the simple device of the tables as the means of working out that principle.

I express no opinion upon the question of jurisdiction, which I have not thought it necessary to examine, as both parties desire to have the case dealt with upon its merits now.

I am authorized to state that the Chief Justice and Mr. Justice Charles Allen concur in the views which I have expressed.

The case was argued at the bar in November, 1884, and re-argued in November, 1885.

*J. L. Stackpole*, for the appellant.

*J. H. Benton, Jr.*, for the appellee.