IN THE MATTER OF THE ACCOUNT OF TRUSTEES UNDER THE WILL OF CHARLES B. HOUSTON, DECEASED.

*Sussex County, Feb.* 24, 1933.

*Howard E. Lynch, Jr.,* for exceptant.

*Charles W. Cullen,* for trustees.

THE CHANCELLOR.: The will of the testator devised his home farm to his wife for life. A codicil authorized a sale of the farm in the event his wife desired it, and in such

case provided that the proceeds should be held by trustees on investment, "the profits and income arising from such investments to be paid over to my said wife so long as she may live," the principal at her death to be paid to his nephew, Henry A. Houston, Jr.

The home farm was sold as authorized by the will in 1920 for $16,400.00. The trustees invested the proceeds in U. S. Second Liberty Loan Bonds at 82. The bonds were payable in 1942, and were subject to call at par and accrued interest on and after November 15, 1927. The principal amount of bonds so purchased was $19,000.00. The bonds were called for payment on November 15, 1927. A few months prior to the call date, the trustees sold the bonds for $19,432.00, yielding a profit of $3,032.00. The Trustees treated the proceeds of sale as capital and reinvested the entire sum in other securities having a face value of $20,500.00, the income from which has ever since been paid to the life beneficiary.

The trustees filed an account on December 7, 1931, showing their treatment of the entire $19,432.00 just referred to as the corpus of the trust.

The widow, who is now Camille B. Stowe, has excepted to the account on the ground that the profit of $3,032.00 realized by the trustees from the sale of the liberty bonds is income payable to her as life beneficiary under the trust and is not to be accounted for as an accretion to the principal.

The question which is presented for decision therefore is whether or not, where trust funds are invested in bonds at a discount, the discount is to be accumulated in favor of a life beneficiary, rather than treated as an accretion to the principal in favor of the remainderman.

The language of the testator gives "the profits and income" from the fund to his widow for life. The word "profits" in this connection is no more extensive in meaning than "income." *Chase v. Union National Bank of Lowell, et al.,* 275 *Mass.* 503, 176 *N. E.* 508; *Stewart v.*

*Phelps,* 71 *App. Div.* 91, 75 *N. Y. S.* 526, affirmed 173 *N. Y.* 621, 66 *N. E.* 1117. The testator directed his trustees, after the death of the widow, to "pay the principal sum" to his nephew. His reference to the "principal sum" does not reveal an intent that the sum when paid over should not exceed the original amount and therefore that accretions which the law would ordinarily allow should be withheld from the remainderman. *Chase v. Union National Bank of Lowell, et al., supra; McElwaine v. Atty. General,* 241 *Mass.* 112, 134 *N. E.* 620.

There is, then, no language of a peculiar character to be found in the will upon which to found a special view apart from general principles. The question which the exceptions propound is, therefore, to be answered in the light of general considerations.

So far as I am advised only two cases are to be found which are directly in point on the question of whether discounts on bonds purchased by trustees are to be credited to income or to principal. The first is *Townsend v. U. S. Trust Co.,* 3 *Redf. Sur.* 220, decided by a New York Surrogate's Court in 1877. It was there held that all the profit on bonds bought by trustees at a discount belonged to the corpus. That case arose at a time when the weight of authority in this country had not settled itself in favor of the proposition that in the case of bonds bought above par, the premium should be made good out of interest. Since the logic that charges premiums against interest is thought to lead by its converse application to the crediting of discounts to income, and since the weight of American authority now supports the charging of premiums against interest (*Perry on Trusts,* [7th Ed.] § 548 *A.;* 4 *A. L. R.* 1249), the decision by the Surrogate's Court in New York might be said to be less persuasive today than it was immediately after its pronouncement. But the Court of Appeals in New York in 1886, apparently by way of dictum however, announced its accord with the decision in the *Townsend Case. In re Gerry,* 103 *N. Y.* 445, 9 *N. E.* 235.

The other case dealing with the question of discounts was decided in 1926, well after the weight of authority had ranged itself behind the rule which charges premiums to interest. The case referred to is *Re Gartenlaub's Estate*, 198 *Cal.* 204, 244 *P.* 348, 350, 48 *A. L. R.* 677. In that case the California Supreme Court, notwithstanding it had shortly before determined that premiums should be amortized out of interest (*Re Gartenlaub's Estate*, 185 *Cal.* 648, 198 *P.* 209, 16 *A. L. R.* 520), refused to recognize its prior decision as logically compelling it to adopt the converse rule that discounts should accumulate in favor of income. The California court's decision in the later *Gartenlaub Case* is criticized by the annotator whose notes are found in the report of the case in 48 *A. L. R.*, as being irreconcilable in reason with the principle of its prior decision regarding premiums which, as before stated, appears now to have the support of the weight of modern American authority. See, also, 31 *Harvard Law Review*, 447, for the view that the two positions of the California court regarding premiums on the one hand and discounts on the other are logically inconsistent. Such appears to be the view likewise of Mr. Justice Holmes. See *Hemmenway v. Hemmenway*, 134 *Mass.* 446, where he spoke for a unanimous court, and *New England Trust Co. v. Eaton*, 140 *Mass.* 532, 4 *N. E.* 69, 54 *Am. Rep.* 493, where he spoke for three dissenting justices in opposition to a majority of four.

In *Perry on Trusts*, (7th Ed.) § 548b, it is said, "if premiums paid for bonds must be borne by the life tenant and paid out of the interest, it would seem that in the converse situation, that is, in the case of bonds purchased at a discount, the profits on such bonds would inure to the life tenant, for the reasoning in the two situations is identical."

The Supreme Court of California, however, in the second *Gartenlaub Case*, took the view that the reasoning which charged premiums upon interest did not compel the crediting of discount to income. Its observations on that point were, as follows:

"A moment's consideration will, however, show that the two situations are not such in either identity or in difference as to give room or reason for such converse application. In the case of premiums they are paid out by the trustee from the corpus of the trust funds in the course of making an investment of such funds in securities which have the twofold desirability of being safe and of yielding a satisfactory return in the way of income; and it is, therefore, held in harmony with the aforesaid principle that the premium at which such securities were purchased should be amortized out of such income in order that the integrity of the corpus may be preserved. But in the case of purchases of securities at a discount, the amount of such discount remains in the hands of the trustee for the time being at least, in the form of uninvested corpus and does not become, as we shall show later, any part of the income or profits of the investment to which the life tenant is entitled under the terms of the trust. It does not, therefore, follow that since the life tenant in the application of said principle to premiums must yield up a portion of the income in order to maintain the integrity of the corpus he must, therefore, be entitled to the discounts which, if allowed him, would impair, for the time being at least, and perhaps imperil in the long run the corpus of the trust fund."

The differentiation which the California court thus made between premium and discount cases is vigorously challenged in the two ably written annotations found in 48 *A. L. R.* 684, *et seq.* The sharp difference of opinion between the advocates of the two conflicting views springs from the acceptance by the one and the rejection by the other of the primary postulate, that where a bond having a definite maturity is purchased below par the discount is to be accounted for solely by the circumstance that its interest rate is below that of the current market. This, as observed by Mr. Justice Holmes in *Hemmenway v. Hemmenway, supra,* is a fiction. That it is so, is also shown by him in his dissent in *New England Trust Co. v. Eaton, supra,* where he points out that the wide spread in prices of safe four per cent. bonds cannot possibly be explained as referable to interest alone. Other circumstances intervene, and even what I may call market whims are factors, which often contribute to the settlement of the price of a security. It is

undoubtedly true that the discount below par at which a presumably safe bond sells is very materially governed by its nominal rate in relation to the current market rate and by the length of maturity. But to say that that is the only contributing factor is, it seems to me, to approach more nearly to a fiction than we do when we allow the market rate of interest to be the sole factor which determines the premium at which a bond sells, which was the side of the question that Justice Holmes was considering in the Massachusetts cases above referred to.

Another of the bases upon which the proposition rests that discounts should go to income is that every bond purchased by a trustee must be presumed to be safe and that it will in due course be paid off. Hence, it must inevitably follow, the argument goes, that the discount will be ultimately collected. If this be so, it is argued, the discount should in justice to the life tenant be amortized according to the recognized bond tables and an annual payment made, on account of the discount, to the life tenant. In many cases, that would involve the necessity of the sale of some of the corpus in order to put the trustee in funds with which to make the annual payments. No harm would result to the remainderman in that case, it is argued, because ultimately when maturity arrived the corpus could be reimbursed by the lump payment to it of the entire accumulated discount.

That is the manner in which logic carries us along when we start from the premise that every bond purchased by a trustee is presumed to be safe and will be paid at its maturity. Of course the purchases made by a trustee of bonds which meet the recognized standards for trust investments are to be presumed to be safe ones as to principal. But the premise exacts that the presumption be a conclusive one. Now I do not see why a court should shut its eyes to all experience and insist that that is conclusively true which daily occurrences in the investment world repeatedly refute. It is not a fact that bonds, though they meet the tests required for trust investments, are bound to be safe and

certain of ultimate payment. If then corpus should be resorted to to make good to income the annual amortization of discounts, as a moment ago was indicated as inherent in the idea that discount represents withheld interest, it is manifest that, in case the bond disappointed the presumption by defaulting and liquidating at less than its purchase price, the corpus, in addition to the capital loss which the authorities are unanimous in holding is to be charged to principal, would be compelled to bear a further loss measured by the extent that it had been drawn upon to pay the annual instalment of discount to income. Now I can see no justification whatever for that result, because if the discount was never realized certainly the trustee has no right to seize upon the assets belonging ultimately to remaindermen to pay it.

I cannot escape the view that the amount of the discount at which a bond is bought is the blend of a number of possible contributing causes, among which the nominal rate of interest in its relation to the market rate is one. It cannot be said to be the only one. Purely accidental circumstances may be, as I have no doubt they often are, important factors. A safe bond which accidental circumstances have depressed may very properly be bought by a trustee not because it is a good speculation, for trustees have no right to speculate, but because it is a safe investment at a bargain price. When the accidentally depressing circumstances are removed, the bond will experience an accidental increase in value—a sort of increase which by all the authorities belongs to corpus. Yet notwithstanding this, those who follow the lead of logic from the assumed premises before referred to, would give all that accidental increase to income.

In the instant case the bonds were bought in 1920 at 82. They had twenty-two years to run before maturity. How much of the discount of eighteen was due to the interest rate and how much to other causes is a pure guess. All that the bond tables can tell us is that if the bonds were

paid at maturity, they would turn out to have yielded a rate of so much per cent. on the money invested. To say that that rate is the proper indication of income payable to the life tenant, rather begs the question, for if the rate is indicative of income it can be so only because the entire discount rightly belongs to the life tenant, and that is the very thing we are questioning. Inasmuch as the discount, so far as is known, may be partly contributed to by accidental circumstances which are potential of accidental gains that become real upon payment, it is manifest that if the whole discount goes to income corpus has had taken from it something which belongs to it as the owner of all accidental increments.

Coming back to the case in hand—the bonds were called for payment in November, 1927. The trustee sold them after notice of call a short while before the call date. Of course the call for payment was what may be spoken of as a purely accidental circumstance. It occasioned a precipitate rise in price. Certainly in any view, the life tenant cannot justly claim the entire discount. At most she could claim the discount only for the years between 1920 when they were bought and 1927 when they were called. The call resulted in what was in essence a forced sale at a profit. Now if there had been no call and the bonds had been sold, so far as the record shows the selling price, though above the cost, may yet have been only so much above as would account for that part of the discount as was attributable to the removal of the accidental circumstances which may have depressed the bonds to the low of eighty-two—an increase that would belong to corpus.

Now I am quite aware that the observations I have been making are based on imagined hypothesis. But so also are the observations of those who would follow the amortization theory, as was pointed out by Mr. Justice Holmes in *Hemmenway v. Hemmenway, supra,* and in *New England Trust Co. v. Eaton, supra.* The trouble with the question is that it is so involved with hypotheses or, to use the word

of Mr. Justice Holmes, with fictions, as the starting point, that from whatever point logic starts its reasoning, it is apt to come out at a result in some instances which seem to shock the sense of practical justice. So forcefully, apparently, did this fact impress itself upon the Massachusetts court when the converse of the present case first came before it, that it finally determined by unanimous vote of the judges, after retaining the case for over three years and hearing it argued three times, that it was unsafe to lay down any general rule on the subject. "We have no reason to doubt," said the court in that case, "that, taking the whole administration of the trust into account, the balance has been evenly· held between the two parties," and the decision was that premiums should not be amortized out of interest.

I am of the opinion that, viewing the matter from its practical aspects and disentangling it from the relentless lead of logic based on assumed premises, there should be even more reluctance to lay it down as an unvarying rule that discounts should in all events be paid to income than that premiums should be borne by interest.

Of course any court which says on the one hand that the burden of premiums shall be borne by life beneficiaries, but that on the other hand discounts shall be denied them, as has the California court, lays itself open to the charge of being logically inconsistent. That may be so. This at least would seem to be clear, that in the case of a court which takes those two apparently conflicting positions, it must be convinced that as a practical matter the risk of doing injustice to remaindermen by guaranteeing to life tenants the discounts is so great that it will not incur it even though the logic that throws on interest the burden of premiums might seem to compel it; and conversely that the rule which amortizes premiums out of interest is generally speaking fraught with no serious consequences of injury to the life tenant.

I am convinced that the rule should not be adopted as a

general one that discounts should go to the life beneficiary. If a general rule must be adopted, it seems to me that it is more apt to serve the ends of practical justice to ·say that, generally speaking, discounts when realized constitute capital gains. Recent and current financial experiences, which of course are probably. very exceptional, are such I. have no doubt as, if their record of defaults were consulted, would reveal rather disturbing situations in many trusts if the rule were applied that corpus must make good all discounts.

. There is nothing shown in this case which would suggest that a special equity exists in favor of the life tenant. I am of the opinion that the exceptions should be overruled.

Order accordingly.