OLD COLONY TRUST COMPANY & others, trustees, *vs.*
QUINCY A. SHAW & others.

Suffolk.   January 21, 1927. — October 21, 1927.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & WAIT, JJ.

*Trust,* Investment of fund, Division as between life beneficiary and re-
mainderman. *Capital and Income.*

The eighth clause of a will creating a trust authorized and empowered
trustees "in their discretion to continue as long as they think wise to
hold stock in mining companies and any other securities or property
of any kind which may be found in my estate at my death, even though
the same be unproductive of income or be of a kind not usually con-
sidered suitable for Trustees to select or hold, or be a larger proportion
in one investment than the Trust Estate should hold." The seventh
clause authorized them "to invest all money from time to time in such

real or personal property as they may think wise." *Held*, that the pro-
visions in the seventh clause broadened those of the eighth clause so
that they gave to the trustees power and authority to convert or ex-
change stock of a mining corporation found in the estate at the testator's
death into a stock or interest in a corporation formed in accordance with
law by a merger or consolidation of that corporation with other mining
corporations in which it had a large, if not a controlling, interest.

The will provided that the trust above described should continue during
the life of the longest liver of the testator's wife and children, and on
the death of such longest liver the trust property, as it then existed, was
to be given to the testator's "lawful issue then living, they taking by
representation according to the stocks," and in default of lawful issue
then living to his heirs by blood. The widow was to receive from the
income $40,000 only, and certain sums for expenses and charitable
disbursements; the balance was to be set apart for the children or their
issue. Among assets of the testator were certain stocks in mining cor-
porations which depreciated in value, and at times paid no dividend.
The companies finally were consolidated with others in which one of
them owned a large, if not a controlling interest. The trustees, de-
termining that these stocks were a wasting investment, but also deter-
mining to hold them under the powers given in the will, paid to the life
beneficiaries from their dividends a sum not greater than five per cent
and credited the balance of the dividends when they exceeded that
amount to principal to be held for the ultimate beneficiaries at the
termination of the trust. There was nothing to show that the payment
of such dividends impaired the value of the shares. Upon a bill in
equity by the trustees for instructions, it was *held*, that

(1) The retention of the stock of the original mining companies and
of the stock issued by the consolidated company was within the powers
given by the will;

(2) The circumstances did not warrant an application of the equitable
doctrine, that personal property given in general terms in trust to be
enjoyed by several persons in succession imports an intent on the part
of the testator that the gift should be converted into authorized invest-
ments and the income of the property so invested or retained be so
divided or apportioned between the life beneficiaries and the remainder-
men that the corpus of the fund should be kept intact;

(3) The life beneficiaries were entitled to the entire amount of divi-
dends received from stock of the mining companies and the consolidated
companies;

(4) Certain payments of cash to the trustees by the original corpora-
tion at the time of the consolidation, as adjustments of capital, having
been "distributions from the surplus accounts of the respective com-
panies" and "so charged in the companies' books of account" and "in
this respect identical with ordinary dividend distributions," should be
treated by the trustees as income, and they, with accumulations of
interest thereon, should be paid to the life beneficiaries.

BILL IN EQUITY, filed in the Supreme Judicial Court for
the county of Suffolk on January 23, 1926, by the trustees

under the will of Quincy A. Shaw, late of Boston, for instructions.

George D. Burrage, Esquire, was appointed guardian *ad litem* or next friend for persons unascertained or unborn, who might in default of issue become interested in the trust as heirs by the blood; and Carleton Hunneman, Esquire, was appointed guardian *ad litem* or next friend for certain minor defendants.

Material facts are stated in the opinion. The suit was reserved by *Braley,* J., for determination by the full court.

*E. A. Taft,* for the plaintiffs, stated the case.

*T. Hunt,* (*W. T. Snow* with him,) for life beneficiaries.

*G. D. Burrage,* guardian *ad litem,* (*D. Burstein* with him,) and *C. Hunneman,* guardian *ad litem,* for ultimate beneficiaries.

PIERCE, J.    This is a bill in equity brought by the trustees under the will of Quincy A. Shaw asking the instructions of this court as to the disposition to be made by them of the income of a trust fund created by the residuary clause, Article Third of the will. The case is now before the full court upon the bill, the answers and certain facts which by the stipulation of the parties "may be treated as if they were facts found by a single justice at a hearing before him, and as if they were a part of the reservation and report by him to this court."

The testator, Quincy A. Shaw, died on June 12, 1908, leaving a will which was duly admitted to probate by a decree entered July 2, 1908. A copy of said will is annexed to the petition and made a part thereof. The testator left surviving him his wife, four adult children and two sons of a deceased son. He also left other grandchildren, and still others have been born since his decease. By Article Third of the will the testator devised and bequeathed the residue of his estate to the trustees named in his will in trust to hold such residue for the longest liver of his widow and children, and on the death of the longest liver he devised and bequeathed the same as it should then exist to his "lawful issue then living, they taking by representation according to the stocks," and in default of lawful issue then living to his

heirs by blood. He directed that from the income of the trust estate there should be paid annually to his wife (a) ". . . forty thousand ($40,000) dollars"; (b) ". . . all expenses of repairs, insurance, taxes, care and maintenance, and all bills connected therewith, of the real estate, the use of which is given to my said wife during her life, by the Second Article of this Will. (c) . . . such sums from time to time as she may require for the maintenance of the various charitable enterprises in which she is now interested . . . ." Article Third contains the further provision as to the disposition of the income after the provision for the wife of the testator: "(d) All the remaining net income, by quarter-yearly payments in every year, in equal shares, to such of my five children as may be living at the time of payment, and to the lawful issue then living of any child who has then deceased, whether such child has died before or after me, such issue taking by representation according to the stocks the share which such my deceased child would have taken if living, excepting, however, that Mary S. Shaw, widow of my deceased son Louis A. Shaw, shall receive during her life one-third of the share of said income payable hereunder to the issue of my deceased son Louis A. Shaw, and excepting also that a beneficiary hereunder shall receive not more than twelve thousand ($12,000) dollars per year until he shall attain the age of twenty-five years, any excess of the annual income above that amount to which he would otherwise be entitled to be held and invested for him by the Trustees until he shall attain that age. If from any cause the income payable hereunder to each of my children shall amount to less than thirty thousand ($30,000) dollars for any year during their respective lives, then I authorize and direct my Trustees to make up such deficiency from the principal, such payments to be deducted from the share of said property held for the issue of the child on whose account such payment may be made." The widow, Pauline A. Shaw, died on February 10, 1917; the four children "are still living."

The value of the estate of Quincy A. Shaw at his death as determined by the tax commissioner for the Common-

wealth, exclusive of the testator's holdings in the Calumet and Hecla Mining Company and the Osceola Consolidated Mining Company, was approximately $13,000,000. The testator at his death had a legal interest in the Calumet and Hecla Mining Company, hereinafter called the Calumet Company, represented by 13,100 shares, and a legal interest in the Osceola Consolidated Mining Company, hereinafter called the Osceola Company, represented by 2,172 shares. On that date, June 12, 1908, the market value of the capital stock of the Calumet Company owned by the testator as listed on the Boston Stock Exchange was $8,646,000, and the value of the capital stock of the Osceola Company owned by him, as indicated by quotations on that exchange, was $195,480, a total of $8,841,480. There is nothing in the bill, in the answers, or in the stipulation of facts from which the value of the assets of the corporations at any time can be determined, and it is well understood that stock of corporations is often salable in the market at less and sometimes at more than the assets of the corporation are really worth. Both companies were Michigan corporations owning and operating copper mines in the State of Michigan.

From the date of the testator's death to July, 1923, under the direct authority of the eighth clause of the will the trustees held the trust stock of the Calumet and the Osceola companies unchanged. Under a corporate increase in capitalization the trustees received a stock dividend in the Calumet Company and then held 104,800 shares. Prior to the death of the testator, under the authority of the laws of the State of Michigan, Pub. Acts, 1905, No. 105, the Calumet Company owned substantial interests evidenced by stock in the capital stock of fourteen other Michigan copper mining corporations.

In September, 1923, the Calumet and the Osceola companies and three other Michigan copper mining corporations under the laws of the State of Michigan were consolidated under the name of Calumet and Hecla Consolidated Copper Company, hereinafter called the Consolidated Company. As a result of the consolidation the trustees received 210,-892.20 shares of the Consolidated Company in exchange for

104,800 shares of Calumet and 2,172 shares of the Osceola companies.

In retaining as a part of the trust property the shares of stock in the Calumet and Osceola companies held by the testator and in continuing to hold the said 210,892.20 shares in the Consolidated Company the trustees have relied on the discretionary authority conferred by paragraph numbered eighth of the will, which reads as follows: "Eighth. I authorize and empower my Trustees in their discretion to continue as long as they think wise to hold stock in mining companies and any other securities or property of any kind which may be found in my estate at my death, even though the same be unproductive of income or be of a kind not usually considered suitable for Trustees to select or hold, or be a larger proportion in one investment than the Trust Estate should hold."

The trustees in their bill alleged that they "still continue to think it wise to retain as a part of the trust property said shares of Calumet and Hecla Consolidated Copper Company. The administrative year of the trust ends on the twelfth day of June, the anniversary of the death of the testator." The brief of the defendant life beneficiaries states that "No question is intended to be raised as to any dividends received by the trustees prior to the year 1923." The trustees in administering the trust during the years ending June 12, 1922, June 12, 1923, June 12, 1924, and June 12, 1925, assumed that the stock of the Calumet Company, the Osceola Company and that of the Consolidated Company should be classified as "wasting investments" and that justice to the remaindermen required that the life beneficiaries should receive in any year out of the dividends received by the trustees from these mining shares a fixed net return of five per cent, computed upon the market value of the shares on the day preceding the commencement of the trust year, as being equivalent to a fair net income for customary trust funds and that the net income excess should be added to the trust capital. There being no income declared for these stocks for the year ending June 12, 1922, the trustees paid nothing with respect to the stocks to the life beneficiaries.

From dividends received for the year ending June 12, 1923, the trustees paid the life beneficiaries with respect to these holdings of stock a sum equal to five per cent on the market value of holdings as of June 12, 1922, and transferred the net balance remaining to capital account. From regular dividends received by the trustees from said mining stocks for the year ending June 12, 1924, the trustees paid to the life beneficiaries by way of income a sum aggregating four and two tenths per cent on the market value on June 12, 1923, of stock of the Calumet Company, and a sum aggregating two and four tenths per cent on the market value on that day of the Osceola Company: an average of four and twenty-four hundredths per cent of the market value of combined holdings of the Calumet and the Osceola companies' stock.

During the year ending June 12, 1925, the trustees received in dividends on the shares in the Consolidated Company $210,892. Of the amount thus received the trustees paid the life beneficiaries $150,260.55, aggregating five per cent of the market value of the shares of the Consolidated Company as of June 12, 1924; the net balance of income amounting to $39,402.93 is retained by the trustees to be disposed of in accordance with the instructions of this court. The trustees allege and the several answers admit that a fair net annual income for the years in question upon investments usually considered suitable for trustees to select and hold has been and now is at the rate of five per cent. During the administrative year ending June 12, 1924, as of September 10, 1923, the trustees received from the Calumet Company a substantial sum of money in the adjustment of capital made as a part of the plan for the consolidation of the several corporations and carried it to the capital trust account on the books of the trustees. The trustees also received during the same administrative year as of September 10, 1923, from the Osceola Company a further sum of money from the assets of that company in the adjustment of capital made as a part of the plan of consolidation, and hold that sum on hand to be accounted for as this court may determine. The trustees "believe and therefore allege that these distributions in

adjustment of capital were distributions from the surplus accounts of the respective companies and were so charged in the companies' books of account, being in this respect identical with ordinary dividend distributions."

The question upon which the trustees seek the instructions of this court are as follows: "(a) Should the whole or any part of the sum now on hand in the corpus of the estate representing the excess in dividends collected during the year ending on June 12, 1923, on shares of Calumet and Hecla Mining Company and Osceola Consolidated Mining Company over and above the amounts distributed to the life beneficiaries during that year and taxes and commissions be distributed now to such life beneficiaries on account of income during that year?    (b) If less than the whole amount of such dividends should now be distributed to such life beneficiaries on account of income for the year ending on June 12, 1923, should the whole or any portion of the excess be distributed to such life beneficiaries on account of the deficiency in income distributions for the year ending on June 12, 1922?    (c) If less than the whole amount of such dividends should now be distributed to such life beneficiaries on account of income for the year ending on June 12, 1923, should the whole or any portion of the excess be distributed to such life beneficiaries on account of the deficiency in income distributions for the year ending on June 12, 1924? (d) If any payments should now be made from the corpus of the estate to the beneficiaries for life on account of dividends received from Calumet and Hecla Mining Company and Osceola Consolidated Copper Company during the year ending on June 12, 1923, should such amounts now be paid with interest, and if so, at what rate?    (e) What disposition should be made of the dividends received from Calumet and Hecla Consolidated Copper Mining Company during the administrative year ending June 12, 1925, after deducting taxes and expenses?    (f) Should a fixed net return be hereafter paid to the beneficiaries entitled to the net income on account of their interest in the stock of Calumet and Hecla Consolidated Copper Company, and if so, what amount should be paid annually, how should the deficiency

in the dividends for any year be made up and should interest be allowed upon any payments which are delayed?   (g) What distribution, if any, should now be made to the beneficiaries for life on account of the amounts received by the Trustees on or as of September 10, 1923, as payments in adjustment of capital of the Calumet and Hecla Mining Company and Osceola Consolidated Mining Company?''

On the foregoing statements of fact and upon the provisions of the will the life beneficiaries contend (1) that they ''are entitled to the entire amount of money received as dividends upon these mining stocks for the years 1923, 1924, 1925, and thereafter, less expenses, and that the trustees had no right to transfer any portion of these dividends, so received by them, to the principal of the fund for the benefit of the remaindermen.   (2) That the sum of $131,000 received from the Calumet Company, September 10, 1923, and also the sum of $2,172 received on the same date from the Osceola Company should be paid over by the trustees to the life beneficiaries.''   It is the contention of all defendants other than the life beneficiaries that ''the will does not authorize the retention as an investment of the shares of stock held by the trustees in the Calumet and Hecla Consolidated Copper Company, and these securities should therefore be converted into proper trust securities or the rights of the parties should be adjusted as if conversion had been made on the date of the acquisition of these securities by the trustees.''

Obviously the first question for decision is, Had the trustees under the will authority to continue the investments of the testator so long as they should think wise to hold such as a permanent investment, and if such power is granted is it restricted by necessary implication to the holding of the identical shares of stock ''which may be found in my estate at my death?''   The power to retain the stock in the mining companies found in the estate of the testator as a permanent investment is conferred on the trustees by the eighth clause of the will quoted, *supra;* and the provision of the seventh clause which authorizes the trustees ''to invest all money from time to time in such real or personal property as they

may think wise," by necessary implication broadened the power, conferred by the eighth clause, to retain the stock interest in its then form, into a power to convert or exchange that stock into a stock or interest in a mining corporation to be formed in accordance with law by the merger or consolidation of the Calumet Company and the Osceola Company with other mining companies in which the Calumet Company owned a large if not the controlling stock interest. It results that the stock held by the trustees in the Consolidated Company is an authorized investment and no duty has ever rested upon the trustees either to convert the stock which was in the estate into another form of investment or to hold and administer the stock interest as if a conversion had been made at the date of its acquisition. The effect upon the rights of the life beneficiaries and the remaindermen in the residue of the estate which resulted from the exercise of the powers conferred upon the trustees by the seventh and eighth clauses of the will, *supra*, was to convert the Calumet, the Osceola and the Consolidated companies' stocks into permanent authorized investments as fully and completely as would have followed a specific bequeathment of them to the trustees to hold for the purposes indicated in the third clause of the will, *supra*.

In a situation like the case before this court there is no room for the operation of the equitable doctrine that personal property given in general terms in trust to be enjoyed by several persons in succession imports an intent on the part of the testator that the gift should be converted into authorized investments and the income of the property so invested, or retained, be so divided or apportioned between the life beneficiaries and the remaindermen that the corpus of the fund shall be kept intact. *In re Bates,* [1907] 1 Ch. 22. *In re Wilson,* [1907] 1 Ch. 394, 397. *In re Nicholson,* [1909] 2 Ch. 111, wherein at page 120, Warrington, J., said, "In my opinion . . . there is no distinction for the purposes of the application of the rule in *Howe* v. *Earl of Dartmouth . . .* [7 Ves. 137a] between unauthorized securities of a wasting and those of a permanent nature." "The real point in such cases is whether the power to continue or retain is to be

construed as a power to continue or retain permanently, or only until the trustees can sell advantageously. In the first case, the inference is that the power was for the benefit of the tenant for life; in the latter, the inference is that it was merely for the convenient administration of the estate." *In re Inman*, [1915] 1 Ch. 187, 191. "The authority given by the will indicated a preference of the life tenant to this extent, which took the case out of the ordinary rule." *New England Trust Co.* v. *Eaton*, 140 Mass. 532, 541. "The power thus given to hold the property as they may receive it, is not an extension of the time for conversion, but authority to continue an investment as such, and the whole net income of investments thus authorized must go to the tenants for life by the terms of the will." *Hemenway* v. *Hemenway*, 134 Mass. 446, 452. *Lovering* v. *Minot*, 9 Cush. 151. *Reed* v. *Head*, 6 Allen, 174. *Buckingham* v. *Morrison*, 136 Ill. 437, 453. *Matter of James*, 146 N. Y. 78, 96, 103. *Gay* v. *Focke*, 291 Fed. Rep. 721.

As regards the payments made to the trustees in the adjustment of capital we are of opinion that such dividends should have been regarded by the trustees as payments of income and treated as such. They were "distributions from the surplus accounts of the respective companies and were so charged in the companies' books of account, being in this respect identical with ordinary dividend distributions." There is nothing in the facts reported which declares or indicates that the payment of these dividends impaired or diminished the value of the shares and they are therefore to be regarded as income to which the life beneficiaries are entitled. *Balch* v. *Hallet*, 10 Gray, 402, 404. *Minot* v. *Paine*, 99 Mass. 101, 108. In *Talbot* v. *Milliken*, 221 Mass. 367, 368, it is said: "The rule for determining the respective rights of those entitled to the income and to the principal of trust funds established long ago in this Commonwealth, and constantly followed, 'is to regard cash dividends, however large, as income, and stock dividends, however made, as capital.'" *Coolidge* v. *Grant*, 251 Mass. 352. *Lannin* v. *Buckley*, 256 Mass. 78. *Old Colony Trust Co.* v. *Jameson,* 256 Mass. 179. See also *Hemenway* v. *Hemenway*, 181

Mass. 406, 410, 411; *Lyman* v. *Pratt,* 183 Mass. 58, 60, 61; *Boston Safe Deposit & Trust Co.* v. *Adams,* 219 Mass. 175, 177. The case of *Brownell* v. *Anthony,* 189 Mass. 442, is distinguishable on its facts from the present case, and is not in opposition to the conclusion here reached.

The trustees are instructed (1) that the life beneficiaries are entitled to the entire amount of money received as dividends upon the stock of the Calumet Company, the Osceola Company and the Consolidated Company for the years 1923, 1924, 1925, and thereafter if such shall be received, less expenses; (2) that the sum of $131,000 received from the Calumet Company on September 10, 1923, and the sum of $2,172 received on September 10, 1923, from the Osceola Company should be paid with all accruements of interest to the life beneficiaries.

*Decree accordingly.*