MARGARET M. MARSMAN[1] vs. JOHN NASCA, executor,[2]
& another.[3]

No. 89-P-1411.

Norfolk. February 14, 1991. - June 28, 1991.

Present: WARNER, C.J., DREBEN, & IRELAND, JJ.

*Trust*, Use of principal, Trustee's discretion, Constructive, Trustee's ac-
counts, Personal liability of trustee. *Fiduciary*.

Provisions of a testamentary trust directing the trustees to pay the life
beneficiary, the testatrix's surviving husband, such amounts of the prin-
cipal "as they shall deem advisable for his comfortable support and
maintenance" imposed a duty on the trustees to inquire into the finan-
cial resources of the beneficiary so as to recognize his needs, and, in an
action by the husband's executrix against the sole remaining trustee,
the judge was warranted in concluding that the trustee had not met his
responsibilities, either as to inquiry or distribution. [795-797]
Although a judge was warranted in finding that, were it not for a trustee's
breach of trust, the life beneficiary would not have had the financial
necessity to convey his residence to his stepdaughter and her husband,
these family members could not appropriately be required to reconvey
the property, where the conveyance to them had been for a sufficient
consideration (an agreement to pay house expenses) and where they
had no notice of the breach of trust and had not themselves committed
any breach of fiduciary duty. [797]
Where a trustee, in breach of his fiduciary duty, failed to make inquiry
into the financial needs of the life beneficiary of the trust, and, in conse-
quence, failed to make permitted distributions for the beneficiary's
"comfortable support and maintenance," the remedy was to impress a
constructive trust, for the beneficiary's estate, on the amounts in the
trust that the trustee should have distributed. [797-798]
In the circumstances, a life beneficiary's assent to a trustee's accounts did
not bar the beneficiary's estate from recovering from the trust the
amounts that should have been distributed but were not because of an
error of the trustee. [798-799]
An exculpatory clause in a will, providing that "[n]o trustee hereunder
shall ever be liable except for his own willful neglect and default,"

---

[1] Individually and as executrix of the estate of T. Frederik Marsman.
[2] One of the defendants, Richard T. Marlette, has died, and his executor,
John Nasca, has been substituted as a defendant.
[3] James F. Farr as trustee under the will of Sara Wirt Marsman.

which had been inserted by the attorney who prepared the instrument and who also served as trustee of the testamentary trust, was effective in the absence of any evidence that the insertion of the clause was an abuse of his fiduciary relationship with the testatrix at the time of drawing the will. [799-801]

CIVIL ACTION commenced in the Norfolk Division of the Probate and Family Court Department on September 15, 1987.

The case was heard by *Elizabeth O'Neill LaStaiti,* J.

*James A. G. Hamilton (Susan E. Stenger* with him) for the plaintiff.

*Leonard F. Clarkin (Harry C. Beach* with him) for James F. Farr, trustee.

*Robert L. Holloway (Jeffrey B. Loeb* with him) for John Nasca, executor.

DREBEN, J. This appeal raises the following questions: Does a trustee, holding a discretionary power to pay principal for the "comfortable support and maintenance" of a beneficiary, have a duty to inquire into the financial resources of that beneficiary so as to recognize his needs? If so, what is the remedy for such failure? A Probate Court judge held that the will involved in this case imposed a duty of inquiry upon the trustee. We agree with this conclusion but disagree with the remedy imposed and accordingly vacate the judgment and remand for further proceedings.

1. *Facts.* We take our facts from the findings of the Probate Court judge, supplemented on occasion by uncontroverted evidence. Except as indicated in note 8, *infra,* her findings are not clearly erroneous.

Sara Wirt Marsman died in September, 1971, survived by her second husband, T. Frederik Marsman (Cappy), and her daughter by her first marriage, Sally Marsman Marlette. Mr. James F. Farr, her lawyer for many years, drew her will and was the trustee thereunder.[4]

Article IIA of Sara's will provided in relevant part:

---

[4]The will provided for two trustees; however, one resigned in April, 1972, and thereafter Farr acted as sole trustee.

"It is my desire that my husband, T. Fred Marsman, be provided with *reasonable maintenance, comfort and support* after my death. Accordingly, if my said husband is living at the time of my death, I give to my trustees, who shall set the same aside as a separate trust fund, one-third (⅓) of the rest, residue and remainder of my estate. . . ; they shall pay the net income therefrom to my said husband at least quarterly during his life; and *after having considered the various available sources of support for him,* my trustees shall, if they deem it necessary or desirable from time to time, in their sole and uncontrolled discretion, pay over to him, or use, apply and/or expend for his direct or indirect benefit such amount or amounts of the principal thereof as they shall deem advisable for his *comfortable support and maintenance.*" (Emphasis supplied).

Article IIB provided:

"Whatever remains of said separate trust fund, including any accumulated income thereon on the death of my husband, shall be added to the trust fund established under Article IIC . . . ."

Article IIC established a trust for the benefit of Sally and her family. Sally was given the right to withdraw principal and, on her death, the trust was to continue for the benefit of her issue and surviving husband.

The will also contained the following exculpatory clause:

"No trustee hereunder shall ever be liable except for his own willful neglect or default."

During their marriage, Sara and Cappy lived well and entertained frequently. Cappy's main interest in life centered around horses. An expert horseman, he was riding director and instructor at the Dana Hall School in Wellesley until he was retired due to age in 1972. Sally, who was also a skilled rider, viewed Cappy as her mentor, and each had great affec-

tion for the other. Sara, wealthy from her prior marriage, managed the couple's financial affairs. She treated Cappy as "Lord of the Manor" and gave him money for his personal expenses, including an extensive wardrobe from one of the finest men's stores in Wellesley.

In 1956, Sara and Cappy purchased, as tenants by the entirety, the property in Wellesley which is the subject of this litigation. Although title to the property passed to Cappy by operation of law on Sara's death, Sara's will also indicated an intent to convey her interest in the property to Cappy. In the will, Cappy was also given a life estate in the household furnishings with remainder to Sally.

After Sara's death in 1971, Farr met with Cappy and Sally and held what he termed his "usual family conference" going over the provisions of the will. At the time of Sara's death, the Wellesley property was appraised at $29,000, and the principal of Cappy's trust was about $65,600.

Cappy continued to live in the Wellesley house but was forced by Sara's death and his loss of employment in 1972 to reduce his standard of living substantially. He married Margaret in March, 1972, and, shortly before their marriage, asked her to read Sara's will, but they never discussed it. In 1972, Cappy took out a mortgage for $4,000, the proceeds of which were used to pay bills. Farr was aware of the transaction, as he replied to an inquiry of the mortgagee bank concerning the appraised value of the Wellesley property and the income Cappy expected to receive from Sara's trust.

In 1973, Cappy retained Farr in connection with a new will. The latter drew what he described as a simple will which left most of Cappy's property, including the house, to Margaret. The will was executed on November 7, 1973.

In February, 1974, Cappy informed the trustee that business was at a standstill and that he really needed some funds, if possible. Farr replied in a letter in which he set forth the relevant portion of the will and wrote that he thought the language was "broad enough to permit a distribution of principal." Farr enclosed a check of $300. He asked Cappy to explain in writing the need for some support and why the

need had arisen.[5] The judge found that Farr, by his actions, discouraged Cappy from making any requests for principal.

Indeed, Cappy did not reduce his request to writing and never again requested principal. Farr made no investigation whatsoever of Cappy's needs or his "available sources of support" from the date of Sara's death until Cappy's admission to a nursing home in 1983 and, other than the $300 payment, made no additional distributions of principal until Cappy entered the nursing home.

By the fall of 1974, Cappy's difficulty in meeting expenses intensified.[6] Several of his checks were returned for insufficient funds, and in October, 1974, in order that he might remain in the house, Sally and he agreed that she would take over the mortgage payments, the real estate taxes, insurance, and major repairs. In return, she would get the house upon Cappy's death.

Cappy and Sally went to Farr to draw up a deed. Farr was the only lawyer involved, and he billed Sally for the work. He wrote to Sally, stating his understanding of the proposed transaction, and asking, among other things, whether Margaret would have a right to live in the house if Cappy should predecease her. The answer was no. No copy of the letter to Sally was sent to Cappy. A deed was executed by Cappy on

---

[5]He also suggested, despite the will's direction that Cappy's trust be set aside as a separate trust, that when principal was paid to Cappy, a proportionate distribution (i.e., twice the sum given to Cappy) be made to Sally. Farr indicated that he was sending a copy of the letter to Sally and hoped "to hear from her." The judge read the letter to imply that Sally should be consulted when and if Cappy requested principal. We need not consider whether this reading is warranted.

[6]After Sara's death, Cappy's income was limited, particularly considering the station he had enjoyed while married to Sara. In 1973, including the income from Sara's trust of $2,116, his income was $3,441; in 1974 it was $3,549, including trust income of $2,254; in 1975, $6,624, including trust income of $2,490 and social security income of $2,576. Margaret's income was also minimal; $499 in 1974, $4,084 in 1975, including social security income of $1,686. Cappy's income in 1976 was $8,464; in 1977, $8,955; in 1978, $9,681; in 1979, $10,851; in 1980, $11,261; in 1981, $12,651; in 1982, $13,870; in 1983, $12,711; in 1984, $12,500; in 1985, $12,567; in 1986, $12,558. The largest portion from 1975 on came from social security benefits.

November 7, 1974, transferring the property to Sally and her husband Richard T. Marlette (Marlette) as tenants by the entirety, reserving a life estate to Cappy. No writing set forth Sally's obligations to Cappy.

The judge found that there was no indication that Cappy did not understand the transaction, although, in response to a request for certain papers by Farr, Cappy sent a collection of irrelevant documents. The judge also found that Cappy clearly understood that he was preserving no rights for Margaret, and that neither Sally nor Richard nor Farr ever made any representation to Margaret that she would be able to stay in the house after Cappy's death.

Although Farr had read Sara's will to Cappy and had written to him that the will was "broad enough to permit a distribution of principal," the judge found that Farr failed to advise Cappy that the principal of his trust could be used for the expenses of the Wellesley home. The parsimonious distribution of $300 and Farr's knowledge that the purpose of the conveyance to Sally was to enable Cappy to remain in the house, provide support for this finding. After executing the deed, Cappy expressed to Farr that he was pleased and most appreciative. Margaret testified that Cappy thought Farr was "great" and that he considered him his lawyer.[7]

Sally and Marlette complied with their obligations under the agreement. Sally died in 1983, and Marlette became the sole owner of the property subject to Cappy's life estate. Although Margaret knew before Cappy's death that she did not have any interest in the Wellesley property, she believed that Sally would have allowed her to live in the house because of their friendship. After Cappy's death in 1987, Marlette inquired as to Margaret's plans, and, subsequently, through Farr, sent Margaret a notice to vacate the premises. Margaret brought this action in the Probate Court.

---

[7]The judge noted that Farr, in response to an interrogatory filed by the plaintiff, stated that he rendered legal services to Sara from approximately 1948-1971; to Cappy from approximately 1951-1987; to Sally from 1974 until prior to her death; and to Marlette since 1983.

After a two-day trial, the judge held that the trustee was in breach of his duty to Cappy when he neglected to inquire as to the latter's finances. She concluded that, had Farr fulfilled his fiduciary duties, Cappy would not have conveyed the residence owned by him to Sally and Marlette. The judge ordered Marlette to convey the house to Margaret and also ordered Farr to reimburse Marlette from the remaining portion of Cappy's trust for the expenses paid by him and Sally for the upkeep of the property. If Cappy's trust proved insufficient to make such payments, Farr was to be personally liable for such expenses. Both Farr and Marlette appealed from the judgment, from the denial of their motions to amend the findings, and from their motions for a new trial. Margaret appealed from the denial of her motion for attorney's fees. As indicated earlier, we agree with the judge that Sara's will imposed a duty of inquiry on the trustee, but we disagree with the remedy and, therefore, remand for further proceedings.

2. *Breach of trust by the trustee.* Contrary to Farr's contention that it was not incumbent upon him to become familiar with Cappy's finances, Article IIA of Sara's will clearly placed such a duty upon him. In his brief, Farr claims that the will gave Cappy the right to request principal "in extraordinary circumstances" and that the trustee, "was charged by Sara to be wary should Cappy request money beyond that which he quarterly received." Nothing in the will or the record supports this narrow construction. To the contrary, the direction to the trustees was to pay Cappy such amounts "as they shall deem advisable for his comfortable support and maintenance." This language has been interpreted to set an ascertainable standard, namely to maintain the life beneficiary "in accordance with the standard of living which was normal for him before he became a beneficiary of the trust." *Woodberry* v. *Bunker*, 359 Mass 239, 243 (1971). *Dana* v. *Gring*, 374 Mass. 108, 117 (1977). See *Blodgett* v. *Delaney*, 201 F.2d 589, 593 (1st Cir. 1953).

Even where the only direction to the trustee is that he shall "in his discretion" pay such portion of the principal as he

shall "deem advisable," the discretion is not absolute. "Prudence and reasonableness, not caprice or careless good nature, much less a desire on the part of the trustee to be relieved from trouble . . . furnish the standard of conduct." *Boyden* v. *Stevens*, 285 Mass. 176, 179 (1934), quoting from *Corkery* v. *Dorsey*, 223 Mass. 97, 101 (1916). *Holyoke Natl. Bank* v. *Wilson*, 350 Mass. 223, 227 (1966).

That there is a duty of inquiry into the needs of the beneficiary follows from the requirement that the trustee's power "must be exercised with that soundness of judgment which follows from a due appreciation of trust responsibility." *Boyden* v. *Stevens*, 285 Mass. at 179. *Woodberry* v. *Bunker*, 359 Mass. at 241. In *Old Colony Trust Co.* v. *Rodd*, 356 Mass. 584, 586 (1970), the trustee sent a questionnaire to each potential beneficiary to determine which of them required assistance but failed to make further inquiry in cases where the answers were incomplete. The court agreed with the trial judge that the method employed by the trustee in determining the amount of assistance required in each case to attain "comfortable support and maintenance" was inadequate. There, as here, the trustee attempted to argue that it was appropriate to save for the beneficiaries' future medical needs. The court held that the "prospect of illness in old age does not warrant a persistent policy of niggardliness toward individuals for whose comfortable support in life the trust has been established. The payments made to the respondent and several other beneficiaries, viewed in light of their assets and needs, when measured against the assets of the trust show that little consideration has been given to the 'comfortable support' of the beneficiaries." *Id.* at 589-590. See 3 Scott, Trusts § 187.3 (Fratcher 4th ed. 1988) (action of trustee is "arbitrary" where he "is authorized to make payments to a beneficiary if in his judgment he deems it wise and he refuses to inquire into the circumstances of the beneficiary"). See also *Kolodney* v. *Kolodney*, 6 Conn. App. 118, 123 (1986).

Farr, in our view, did not meet his responsibilities either of inquiry or of distribution under the trust. The conclusion of

the trial judge that, had he exercised "sound judgment," he would have made such payments to Cappy "as to allow him to continue to live in the home he had occupied for many years with the settlor" was warranted.

3. *Remedy against Marlette.* The judge, concluding that, had Farr not been in breach of trust, "[C]appy would have died owning the house and thus able to devise it to his widow, the plaintiff," ordered Marlette to convey the house to Margaret. This was an inappropriate remedy in view of the judge's findings. She found that, although the relationship between Cappy and Sally was "close and loving," there was "no fiduciary relation between them" and that Sally and Marlette "were not unjustly enriched by the conveyance." She also found that "Sally and Richard Marlette expended significant monies over a long period of time in maintaining their agreement with [C]appy."

Because the conveyance was supported by sufficient consideration (the agreement to pay the house expenses) and because Sally and Marlette had no notice of a breach of trust and were not themselves guilty of a breach of fiduciary duty, they cannot be charged as constructive trustees of the property. *Jones* v. *Jones*, 297 Mass. 198, 207 (1937). That portion of the judgment which orders Marlette to convey the property is vacated.

4. *Remainder of Cappy's trust.* The amounts that should have been expended for Cappy's benefit are, however, in a different category. More than $80,000 remained in the trust for Cappy at the time of his death. As we have indicated, the trial judge properly concluded that payments of principal should have been made to Cappy from that fund in sufficient amount to enable him to keep the Wellesley property. There is no reason for the beneficiaries of the trust under Article IIC to obtain funds which they would not have received had Farr followed the testatrix's direction. The remedy in such circumstances is to impress a constructive trust on the amounts which should have been distributed to Cappy but were not because of the error of the trustee. Even in cases where beneficiaries have already been paid funds by mistake,

the amounts may be collected from them unless the recipients were bona fide purchasers or unless they, without notice of the improper payments, had so changed their position that it would be inequitable to make them repay. 5 Scott, Trusts § 465, at 341 (Fratcher 4th ed. 1989). *Allen* v. *Stewart*, 214 Mass. 109, 113 (1913). *Welch* v. *Flory*, 294 Mass. 138, 144 (1936). See *National Academy of Sciences* v. *Cambridge Trust Co.*, 370 Mass. 303, 307 (1976). Here, the remainder of Cappy's trust has not yet been distributed, and there is no reason to depart from the usual rule of impressing a constructive trust in favor of Cappy's estate on the amounts wrongfully withheld. There is also no problem as to the statute of limitations. The period of limitations with respect to those we hold to be constructive trustees (the beneficiaries of the trust under Article IIC) has not run as, at the earliest, their entitlement to funds occurred at Cappy's death in 1987.

That Cappy assented to the accounts is also no bar to recovery by his estate. The judge found that he was in the dark as to his rights to receive principal for the upkeep of the home. An assent may be withdrawn by a judge "if it is deemed improvident or not conducive to justice." *Swift* v. *Hiscock*, 344 Mass. 691, 693 (1962). See *Akin* v. *Warner*, 318 Mass. 669, 675 (1945). The accounts were not allowed, and we need not consider the effect of G. L. c. 206, § 24,[8] which permits the impeachment of an account after a final decree has been entered only for "fraud or manifest error." See *Holyoke Natl. Bank* v. *Wilson*, 350 Mass. at 228; *National Academy of Sciences* v. *Cambridge Trust Co.*, 370 Mass. at 309.

---

[8]The docket shows that the judge was in error in finding that the accounts were allowed. They were assented to but not allowed. In Loring, A Trustee's Handbook § 62 (Farr rev. 1962) the author states: "[P]reparing annual accounts, signed by the adult beneficiaries and allowing them to continue without adjudication is an unsafe procedure for the trustee."

The amounts to be paid to Cappy's estate have not been determined.[9] On remand, the Probate Court judge is to hold such hearings as are necessary to determine the amounts which should have been paid to Cappy to enable him to retain possession of the house.

5. *Personal liability of the trustee.* Farr raises a number of defenses against the imposition of personal liability, including the statute of limitations, the exculpatory clause in the will, and the fact that Cappy assented to the accounts of the trustee. The judge found that Farr's breach of his fiduciary duty to inquire as to Cappy's needs and his other actions in response to Cappy's request for principal, including the involvement of Sally in distributions of principal despite Sara's provision that Cappy's trust be administered separately, led Cappy to be unaware of his right to receive principal for house expenses. The breach may also be viewed as a continuing one. In these circumstances we do not consider Cappy's assent, see *Swift* v. *Hiscock*, 344 Mass. at 693, or the statute of limitations to be a bar. See *Greenfield Sav. Bank* v. *Abercrombie*, 211 Mass. 252, 259 (1912); *Allen* v. *Stewart*, 214 Mass. at 113; *Akin* v. *Warner*, 318 Mass. at 675-676. The judge also found that Margaret learned of Cappy's right to principal for house expenses only when she sought other counsel after his death.

The more difficult question is the effect of the exculpatory clause. As indicated in part 3 of this opinion, we consider the order to Marlette to reconvey the property an inappropriate remedy. In view of the judge's finding that, but for the trustee's breach, Cappy would have retained ownership of the house, the liability of the trustee could be considerable.

Although exculpatory clauses are not looked upon with favor and are strictly construed, such "provisions inserted in the trust instrument without any overreaching or abuse by the trustee of any fiduciary or confidential relationship to the settlor are generally held effective except as to breaches of

---

[9]Marlette's expenses, which may constitute evidence of the amounts which should have been paid to Cappy, were not established at the time of the judge's findings.

trust 'committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary.' " *New England Trust Co.* v. *Paine,* 317 Mass. 542, 550 (1945), *S.C.,* 320 Mass. 482, 485 (1946). See *Dill* v. *Boston Safe Deposit & Trust Co.,* 343 Mass. 97, 100-102 (1961); *Boston Safe Deposit & Trust Co.* v. *Boone,* 21 Mass. App. Ct. 637, 644 (1986). The actions of Farr were not of this ilk and also do not fall within the meaning of the term used in the will, "willful neglect or default."

Farr testified that he discussed the exculpatory clause with Sara and that she wanted it included. Nevertheless, the judge, without finding that there was an overreaching or abuse of Farr's fiduciary relation with Sara, held the clause ineffective. Relying on the fact that Farr was Sara's attorney, she stated: "One cannot know at this point in time whether or not Farr specifically called this provision to Sara's attention. Given the total failure of Farr to use his judgment as to [C]appy's needs, it would be unjust and unreasonable to hold him harmless by reason of the exculpatory provisions he himself drafted and inserted in this instrument."

Assuming that the judge disbelieved Farr's testimony that he and Sara discussed the clause, although such disbelief on her part is by no means clear, the conclusion that it "would be unjust and unreasonable to hold [Farr] harmless" is not sufficient to find the overreaching or abuse of a fiduciary relation which is required to hold the provision ineffective. See Restatement (Second) of Trusts § 222 comment d (1959).[10]

---

[10]The Restatement lists six factors which may be considered in determining whether a provision relieving the trustee from liability is ineffective on the ground that it was inserted in the trust instrument as a result of an abuse of a fiduciary relationship at the time of the trust's creation. The six factors are: "(1) whether the trustee prior to the creation of the trust had been in a fiduciary relationship to the settlor, as where the trustee had been guardian of the settlor; (2) whether the trust instrument was drawn by the trustee or by a person acting wholly or partially on his behalf; (3) whether the settlor has taken independent advice as to the provisions of the trust instrument; (4) whether the settlor is a person of experience and judgment or is a person who is unfamiliar with business affairs or is not a person of much judgment or understanding; (5) whether the insertion of

We note that the judge found that Sara managed all the finances of the couple, and from all that appears, was competent in financial matters.

There was no evidence about the preparation and execution of Sara's will except for the questions concerning the exculpatory clause addressed to Farr by his own counsel. No claim was made that the clause was the result of an abuse of confidence. See *Boston Safe Deposit & Trust Co.* v. *Boone*, 21 Mass. App. Ct. at 644.

The fact that the trustee drew the instrument and suggested the insertion of the exculpatory clause does not necessarily make the provision ineffective. Restatement (Second) of Trusts § 222 comment d. No rule of law requires that an exculpatory clause drawn by a prospective trustee be held ineffective unless the client is advised independently. Cf. *Barnum* v. *Fay*, 320 Mass. 177, 181 (1946).

The judge used an incorrect legal standard in invalidating the clause. While recognizing the sensitivity of such clauses, we hold that, since there was no evidence that the insertion of the clause was an abuse of Farr's fiduciary relationship with Sara at the time of the drawing of her will, the clause is effective.

Except as provided herein, the motions of the defendants for a new trial and amended findings are denied. The plaintiff's claim of error as to legal fees fails to recognize that fees under G. L. c. 215, § 45, are a matter within the discretion of the trial judge. We find no abuse of discretion in the denial of fees.

The judgment is vacated, and the matter is remanded to the Probate Court for further proceedings to determine the amounts which, if paid, would have enabled Cappy to retain

the provision was due to undue influence or other improper conduct on the part of the trustee; (6) the extent and reasonableness of the provision."

ownership of the residence. Such amounts shall be paid to Cappy's estate from the trust for his benefit prior to distributing the balance thereof to the trust under Article IIC of Sara's will.[11]

*So ordered.*

[11]Since Cappy received the income on the "augmented" principal, interest should not be charged on the sums to be distributed to Cappy's estate for the period prior to his death.