**Sylvia H. McDONALD, Plaintiff,**

v.

**FIRST NATIONAL BANK OF BOSTON; Estate of Charles F. Hovey, Charles F. Hovey, Jr., Executor; and Henry R. Guild, Jr., Defendants.**

**Civil Action No. 93–11822–GAO.**

United States District Court, D. Massachusetts.

May 29, 1997.

Earle C. Cooley, Cooley, Manion, Moore & Jones, P.C., Boston, MA, Edward C. Cooley, Giarusso, Norton, Cooley & McGlone, Quincy, MA, for Sylvia H. McDonald.

Jeffrey F. Jones, Eric F. Menoyo, Jordana B. Glasgow, Palmer & Dodge, Boston, MA, for The First Nat. Bank of Boston.

Leonard M. Singer, Heidlage & Reece, P.C., Boston MA, for Estate of Charles F. Hovey, Charles F. Hovey, Jr.

Peter M. DelVecchio, Ropes & Gray, Boston, MA, Joan McPhee, Joanne McPhee, Jennifer N. Samsel, Ropes & Gray, Providence, RI, Edward A. Broderick, Ellis & Rapacki, Boston, MA, for Harry R. Guild, Jr.

### MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiff, Sylvia H. McDonald ("Mrs. McDonald"), as life beneficiary of certain trusts and as assignee of the rights of the remainder beneficiaries of the trusts, brought suit against the trustees, the First National Bank of Boston (the "Bank"), Charles F. Hovey ("Hovey"),[1] and Henry Guild ("Guild"), alleging mismanagement of the trusts' assets.[2] The defendants moved for summary judgment. The magistrate judge to whom the motions were referred recommended that summary judgment be granted for all the defendants. The plaintiff filed objections to the magistrate judge's report.

In reviewing the magistrate judge's report, this Court is obliged to make a de novo determination of those portions of the report, including specific proposed findings and recommendations, to which objection has been made. 28 U.S.C. § 636(b)(1). The Court may accept, reject, or modify uncontested portions in whole or in part. *Id.*

For the reasons stated below, the defendant's motions for summary judgment are granted.

### I. Summary

The trusts in question held high concentrations of shares of the family holding company. As trustees, the defendants were given the responsibility to manage the trusts' assets, but they were not given any particular mandate to diversify the trusts' holdings. In fact, the trust instruments included exculpatory clauses which specifically empowered the trustees to retain the shares, even if such retention would otherwise be considered imprudent.

The plaintiff contends that as the stock fell in value, the defendants should have sold it more quickly than they did. However, even though the delays in selling may have been imprudent or even foolish, Massachusetts law is clear that trustees who have the benefit of valid exculpatory clauses, as these trustees did, are not liable for actions taken as trustees unless they acted fraudulently or with reckless indifference. The facts of this case do not support a finding of fraud or reckless indifference against the trustees, and the defendants are entitled to judgment in their favor.

### II. Factual Background

The relevant facts are as follows:[3] Mrs. McDonald is the lifetime beneficiary of three trusts, referred to by the parties as the "Hurd Trust," the "Will Trust," and the "McDonald Trust." The Hurd Trust was estab-

---

1. Hovey is deceased. This action is brought against his estate and is defended by his son as executor of the estate.

2. The plaintiff sued the defendant trustees for breach of fiduciary trust and duty of trust (Count I), breach of duty of loyalty (Count II), breach of contract and the implied covenant of good faith and fair dealing (Count III), gross negligence (Count VI), impermissible delegation of authority (Count VII), and fraud (Count VIII). She has since dropped Counts VII and VIII. The plaintiff also sued the Bank separately for breach of contract (Count IV) and negligence (Count V).

3. Because the defendants have moved for summary judgment, the Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995).

lished in 1945 by the plaintiff's mother, Ruth Hurd, as an irrevocable *inter vivos* trust. Defendant Hovey was appointed as a trustee in 1949, and defendant Guild became a trustee in 1988. The Will Trust, established in 1952, was an irrevocable trust created by the will of Ruth Hurd. Hovey and the Bank are trustees of the Will Trust. The McDonald Trust was a revocable trust established by the plaintiff herself in 1969, and its trustees are Hovey and the Bank.

Each trust instrument contains an exculpatory clause. These clauses provide as follows: *Hurd Trust*, ¶¶ 4, 5(b):

> [S]aid Trustee shall have the following powers to be exercised by him in his absolute and final discretion:
>
> .      .      .      .      .
>
> Power to invest and reinvest from time to time any money or property in such manner and at such time as may be deemed expedient and to purchase at any time or hold any securities or property of any kind even though the same be unproductive of income or be of a kind not usually considered suitable for trustees to select or hold in the absence of express authority and to purchase at any time or hold a larger proportion in any one investment than trustees should ordinarily purchase or hold, including power to purchase or hold securities which, excepting for the provisions of this paragraph, would be considered unsuitable for two or more of the reasons above enumerated.
>
> .      .      .      .      .
>
> Without limiting the generality of the powers conferred upon the Trustee by Paragraph FOURTH hereof, I expressly authorize my Trustee in his discretion to retain all or any part of the shares of The Manufacturers Company transferred by me in pursuance of this deed of trust, or any securities or obligations of said corporation, or of any other corporation or association which may be received in exchange for said shares, until such time as my

Trustee shall deem advisable to dispose of said shares.

*WillTrust*, ¶ 9(B); Codicil at p. 4:

> [The trustees] shall have full power to make or change investments as they, in their own uncontrolled discretion, may see fit and to purchase or continue to hold investments even though unproductive of income. or even though a larger proportion of the entire trust property is thereby retained in one investment or one type of investment than otherwise might be considered suitable or prudent in the investment of trust property....
>
> No executor or trustee shall be responsible for errors in judgment or the acts, defaults or neglects of any person employed by an executor or trustee, but shall be responsible only for his, her or its own misfeasance or wilful default and not for any loss or liability otherwise caused.

*McDonald Trust*, ¶¶ 8, 11(b):

> No Trustee shall be responsible for the acts or omissions of another Trustee or for allowing another Trustee to have custody or control of the funds, securities or property. Each Trustee shall be responsible only for his or its own acts or omissions in bad faith.
>
> The Trustees shall have full power to retain any investments indefinitely and to make or change investments as they shall, in their sole uncontrolled discretion, deem advisable and in the best interests of the trust, notwithstanding the fact that any or all of the investments made or retained are of a character or of a size or of a character and size which but for this express authority would not be considered proper for trustees....

The trusts' assets consisted largely of stock in The Manufacturers Company ("Manufacturers"), a family holding company established by the plaintiff's grandfather. Manufacturers in turn owned mostly shares of Wyman Gordon Company ("Wyman Gordon").[4] When Manufacturers liquidated in 1986, the Wyman Gordon stock it held was

---

4. Wyman Gordon manufactured forged metal components used in the defense and commercial transportation industries. Its stock was an investment grade security publicly traded on the New York Stock Exchange.

distributed to the three trusts. The Hurd Trust received 36,461 shares of Wyman Gordon stock (representing 46.8% of the trust's total assets); the Will Trust received 35,499 shares of Wyman Gordon stock (55.1% of its total assets); and the McDonald Trust received 80,306 shares (63% of its total assets)

The market value of the Wyman Gordon stock declined steadily throughout most of the time period relevant to the plaintiff's claims. In the years before the liquidation of Manufacturers, the price of the Wyman Gordon stock had dropped dramatically, eroding millions of dollars in value. At the time of Manufacturers' liquidation in 1986, Wyman Gordon stock was worth $14.25 per share. Thereafter, the price of the stock continued to decline, reaching a low of $3.50 per share in December 1991.

As trustees of the Hurd Trust, Guild and Hovey sold 1,800 Wyman Gordon shares in 1988, another 1,800 shares in 1989, and 2,400 shares in 1990. Finally in 1991, when the stock price had fallen to $6.90 per share (down from a high of $36.70 per share in May 1983), they sold the remaining 30,000 shares.[5]

The Will and McDonald Trusts were, as a practical matter, managed by Ralph H. Marks, Jr. ("Marks"), the Bank's investment manager for the trusts from 1980–1994. Marks divested the Will Trust of Wyman Gordon stock by selling substantial blocks of it on a quarterly basis, starting in January 1988. The final 5,000 shares were sold in May 1990 for $13.25 per share. Similarly, over a period of four years the McDonald Trust was also divested of its Wyman Gordon shares. The final 39,000 shares were sold in December 1991, when the stock price had fallen to a low of $3.50 per share.

There is evidence that the defendants knew or should have known that the trusts' continued retention of the Wyman Gordon stock in such large quantities was unwise. Such a high concentration in the trusts' holdings was contrary to the Bank's internal guidelines, which recommended that the corpus of a trust consist of two-thirds stock or equities, and one-third fixed income or bonds, with no more than ten percent of each in any single investment. Moreover, in 1976 (a decade before the liquidation of Manufacturers), Hovey had expressed concern about the trustees' potential liability to the beneficiaries because such a large percentage of the trusts' principal was invested in equities.

The stock had a history of declining market value, both before and after the liquidation of Manufacturers. For example, *ValueLine Reports* for the relevant years (which Guild says he reviewed) indicate that the stock's future was highly questionable.[6] As early as 1986, Marks also believed that the Wyman Gordon Company was in a "sick industry and the future profitability was highly questionable." Deposition of Ralph Marks at 62. He based this opinion on the "[l]evel of sale over a period of time, gross profit on sales, cash flow over a period of time, dividend record over a period of time, the actual earnings, and other measures." *Id.*

The defendants offer several explanations for their continued retention of the stock. Guild claims that it was beneficial because it deferred capital gains. This benefit, however, was very small compared with the plaintiff's subsequent income and tax losses caused by the stock's retention. Second, he argues that because the stock paid relatively high dividends, retention was consistent with what he understood to be the plaintiff's inter-

---

5. Four hundred and sixty-one shares had been sold in 1987 before Guild became a trustee.

6. Some of the *Value Line Reports* were as follows:
BASED ON RECENT EARNINGS AND PRICE WEAKNESS, WYMAN GORDON SHARES ARE RANKED 4 (Below Average) FOR TIMELINESS. (January 16, 1987).
WYMAN GORDON WILL AGAIN FACE A DIFFICULT MARKET ENVIRONMENT IN 1988. (April 15, 1988).

WYMAN GORDON WAS PROBABLY GLAD TO CLOSE THE BOOKS ON 1989. (January 12, 1990).
WE DOUBT THAT THE COMPANY WILL EARN ITS COMMON DIVIDEND REQUIREMENT IN 1991, WHICH RAISES THE POSSIBILITY OF A REDUCTION IN THE PAYOUT. (January 11, 1991). (*See* Pl.'s Mem. in Opp'n to Bank's Mot. to Compel, Ex. 4).

est in maximizing the trust's income. However, Guild's information about Mrs. McDonald's financial goals came from Hovey; he never asked the plaintiff directly. The plaintiff denies that she was mainly interested in maximizing the income. Instead, she wanted to maximize growth and had explicitly told Hovey this.

Marks explained that he believed it would have been imprudent to sell all of the Wyman Gordon shares at once because quick sales would have depressed the stock's price even more. As to the McDonald Trust, Marks claims that because the trust was revocable, it was his practice to consult with the plaintiff and her husband, Dr. McDonald, before implementing any investment strategy, and it was *their* refusal to sell which slowed down the process of divestment. Letters exchanged between the parties indicate that between 1987 and 1991, Marks made recommendations to sell that Dr. and Mrs. McDonald either rejected or substantially reduced.[7]

Apart from the investment decisions, the Bank admits that it miscalculated the tax basis of the Wyman Gordon shares held in the Will Trust. Though the Wyman Gordon shares were received by the McDonald and Will Trusts at the same time, the Bank assigned substantially different tax bases to each trust's shares. Dr. McDonald alerted the Bank to this error in 1987, but the Bank did not correct it until August 1991, after receiving a letter from the McDonalds' attorney asking that the matter be investigated. Because of the error, incorrect tax returns for the Will Trust were filed for 1988, 1989, and 1990, and the Trust subsequently became liable for additional taxes, penalties, and interest. The Bank paid the penalties but deducted the additional taxes and interest from the Will Trust's principal.

## III. Discussion

The magistrate judge recommended that summary judgment be granted for the defendants on all counts. The plaintiff raises four objections to the magistrate judge's report. First, she contends that the magistrate judge wrongfully concluded that exculpatory clauses in trust instruments are always valid. Second, she argues that there exist disputed issues of material fact as to whether the defendants were recklessly indifferent to their fiduciary responsibilities and therefore liable, notwithstanding the exculpatory clauses. Third, she contends that she can lawfully assert the rights of her children as beneficiaries so that this action is not barred by the statute of limitations. Finally, she argues that a contract independent of the trust instrument existed between her and the Bank in its provision of tax services, and thus the Bank's errors are not protected by the exculpatory clauses. Except for the objection about the statute of limitations, the objections are overruled.

*Statute of limitations*

The plaintiff filed this action on August 20, 1993. The usual application of the three-year statute of limitations, Mass. Gen. L. ch. 260, § 2A, would bar consideration of any of the defendants' alleged misconduct which occurred before August 20, 1990. The plaintiff, however, contends that the statute of limitations does not affect her action because she sues not only for herself as life beneficiary but also on behalf of her children as remaindermen beneficiaries. Her children, she argues, had no notice of the possible accrual of their claims because they never received any trust accountings, and thus their suit is not barred by the statute of limitations.[8]

The statute of limitations inquiry presents two separate questions. First, is the right of the plaintiff's children to maintain suit against the trustees assignable to the plain-

---

**7.** The plaintiff claims that she was only consulted about the tax implications of the sales and not about whether the sales should be made at all. To the extent that she and her husband opposed the sales, they did so because they knew that the information given by the Bank about the tax basis of the shares was inaccurate. Thus they did not want to sell the shares without knowing what the tax ramifications would be.

**8.** The magistrate judge rejected the plaintiff's arguments and recommended that even if the children's rights were assignable, their cause of action accrued at the same time as the plaintiff's so that they would face the same statute of limitations bar.

tiff? If so, when did the statute of limitations start to run against their claims? [9]

The law is fairly settled that the plaintiff's children can bring suit on behalf of the trust to recover for damages suffered by the trust. *See O'Brien v. Dwight*, 363 Mass. 256, 294 N.E.2d 363 (1973) (appointed to represent the interests of named and unnamed minor contingent beneficiaries, guardian ad litem could maintain suit to object to allowance of trustee's account and otherwise protect beneficiaries' interests); *see also* Austin Wakeman Scott and William Franklin Fratcher, *The Law of Trusts*, § 214 (4th ed.1988).

It is also settled under Massachusetts law that the statute of limitations does not start to run against a party asserting a tort claim until she knows or has reason to know that her cause of action has accrued. *Riley v. Presnell*, 409 Mass. 239, 565 N.E.2d 780 (1991). Accepting for present purposes the plaintiff's contention that none of her children received accountings or other information that would have alerted them to the trustees' alleged mismanagement of the trusts' assets, the Court concludes that the statute of limitations does not bar their cause of action.

*Exculpatory clauses*

The magistrate judge did not conclude that exculpatory clauses are *always* valid. He did, however, conclude correctly that the exculpatory clauses at issue here are valid, in the absence of evidence of overreaching by the defendants.[10] Under Massachusetts law, an exculpatory clause is enforceable unless there is evidence of overreaching or abuse by the trustee in obtaining the insertion of the clause in the instrument. *Marsman v. Nasca*, 30 Mass.App.Ct. 789, 573 N.E.2d 1025, 1032 (1991). Such a clause will protect trustees from liability ex-

cept as to breaches of trust "committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary." *New England Trust Co. v. Paine*, 317 Mass. 542, 59 N.E.2d 263, 269 (1945) (internal quotations omitted). Thus, the magistrate judge correctly held that "[i]n order to prevail, plaintiff must show that these trustees 'willfully' or 'intentionally' mismanaged the trust assets, or mismanaged the trust assets with 'reckless indifference' to the preservation of the trust corpus." *Report and Recommendation*, at 20–21.

Furthermore, the magistrate judge was also correct that on the facts of this case, no reasonable juror could conclude that the trustees had acted with reckless indifference or that they had willfully defaulted. The wrongful behavior the plaintiff asserts was that the defendants retained the Wyman Gordon stock in larger quantities and for a longer time than might normally be considered prudent. But, unfortunately, that is exactly what the exculpatory clauses empowered them to do.

Massachusetts courts have denied liability in similar cases. In *Paine*, the defendant trustee who delayed the sale of stock in one railroad company despite the stock's falling price and invested disproportionately in the stock of another railroad company was protected by the trust's exculpatory clause. 59 N.E.2d at 272. "At most, these were no more than failures to exercise the degree of judgment required in the circumstances. They did not amount to bad faith or to intentional breaches of trust or to reckless indifference to the interest of the beneficiaries." *Id.* Similarly, in *Old Colony Trust Co. v. Shaw*, 261 Mass. 158, 158 N.E. 530 (1927), the Supreme Judicial Court upheld the validity of a trust provision which explicitly empowered the trustee to retain mining stock even if the stock paid no dividends, was not

9. The magistrate judge concluded that the plaintiff's children had no ability to bring suit and thus no rights to assign. Even if the children had assignable rights, the rights were no better than the plaintiff's right to sue so that the statute of limitations would bar their suit as well.

10. Through her written objections and in oral argument before this Court, the plaintiff has

dropped her previous claims that the exculpatory clauses are invalid and that the defendants, some of whom were trustees for other trusts holding Wyman Gordon stock, had a conflict of interest. Now she argues only that the defendants' behavior fell outside the protection of the exculpatory clauses.

usually considered suitable for trust investment, or made up a disproportionately large percentage of the trust's investment. 158 N.E. at 533–534.

The lack of evidence of the required degree of wrongdoing is particularly apparent in Guild's case. Within three years of his appointment, he and his co-trustee had divested the Hurd Trust of all its Wyman Gordon stock. The record shows that he did some research, although limited and arguably incorrect, on the performance of the stock. In deciding to keep the stock for as long as he did, Guild was responding to what he understood, apparently mistakenly and perhaps negligently, to be the plaintiff's financial goal. *See Marsman*, 573 N.E.2d at 1032–33 (exculpatory clause protected trustee who failed to inquire into beneficiary's financial needs). Finally, the exculpatory clause in the Hurd Trust explicitly allowed Guild and Hovey to retain "all or any part of the shares of The Manufacturers Company ... or of any other corporation or association which may be received in exchange for said shares." *Hurd Trust*, ¶ 5.

The inquiry into the potential liability of Hovey and the Bank yields a similar answer. As to the Will Trust, the record shows that the trustees had a timetable for disposition of the stock, selling five to ten thousand shares roughly on a quarterly basis. Though it might have been more prudent for the trustees to start the sales earlier and to sell in larger quantities, the trustees' failure to do so is not actionable, given the broad scope of the exculpatory clauses.

The sales of Wyman Gordon stock from the McDonald Trust were more erratic, both in terms of timing and quantity, but even as to that trust, the record shows that the trustees were in regular communication with the plaintiff, making recommendations to sell that she either rejected or reduced.[11] As

with the Will Trust, the trustees of the McDonald Trust may have exercised bad judgment, but by operation of the exculpatory clauses, they are not liable for bad judgment.

*Bank's liability for tax services*

■ Apart from her claims about the trustees' investment decisions, the plaintiff also complains that the Bank was negligent in its provision of tax advice and services to the Will Trust. Specifically, the plaintiff claims (and the record supports her claim) that the Bank dragged its feet in calculating the tax cost basis of the Wyman Gordon stock despite many requests from the plaintiff and her husband for the information. The Bank finally provided correct cost basis information in 1991.[12]

However, the plaintiff has not shown that she was harmed by the Bank's alleged negligence. The additional taxes that the Trust had to pay were taxes that it properly owed, and the penalties were paid by the Bank. The only contested effect of the tax miscalculation was the interest the trust had to pay the Internal Revenue Service (the "IRS"). The Bank points out that the trust earned interest on the amount that should have been, but was not, timely paid to the IRS, and argues that the interest earned by the retention of the unpaid tax amount offsets the interest later paid to the IRS.

The Court is mindful that on this motion for summary judgment the facts are to be read in the light most favorable to the plaintiff. *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36–37 (1st Cir.1995). Nevertheless, proof of damages is an essential part of any negligence claim, and the plaintiff has had ample time to offer evidence of a net loss. At the summary judgment hearing, the Court specifically asked whether the plaintiff had actually suffered damages as a result of the Bank's alleged negligence. After the

---

11. The plaintiff claims that she hesitated to sign off on sales because she did not have accurate tax information, information that the Bank did not provide (correctly) until 1991. To the extent that the provision of tax information could be considered part of the Bank's trustee duties, the Bank's negligence did not rise to the level of reckless indifference.

12. The plaintiff correctly argues that the Bank's tax services are outside of its duties as trustee, and thus it is not protected as tax adviser by the trust exculpatory clauses. There is evidence that the Bank charged an additional fee for its tax services which supports the conclusion that the Bank considered those services to be separate from its trustee services. *See* Marks' Deposition at 134–35.

hearing, the plaintiff submitted a four-page response but failed to provide any concrete estimate of damages. In these circumstances, the Court concludes that the plaintiff does not have proof of any actual damages in this respect, and her claim is therefore deficient as a matter of law.

### Conclusion

For all the foregoing reasons, the defendants' motions are granted, and the complaint is dismissed.

SO ORDERED.